490 A.2d 1228

**Kenneth James LODOWSKI**

v.

**STATE of Maryland.**

**No. 154, Sept. Term 1983.**
**No. 1, Sept. Term 1984.**

Court of Appeals of Maryland.

April 23, 1985.

692

694

696

Gary W. Christopher, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, George E. Burns, Jr. and Sherrie R. Berger, Asst. Public Defenders and William C. Brennan, Jr., and Richard H. Sothoron, Jr., Baltimore, of counsel, on brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

Opinion by ORTH, Judge.

## THE CRIMES

Shortly before midnight on 11 June 1983, Carlton Xavier Fletcher and Minh Huong Phamdo were ambushed on the parking lot of the Goddard Minimart in Greenbelt, Maryland, and murdered by a wilful, deliberate and premeditated killing. Fletcher was a member of the Prince George's County Police Department, working on his own time as a security guard for Minimart. Phamdo was the assistant manager of Minimart. He had just left the store carrying bags containing some $24,000 of the store's money which he was to place in a bank's night depository. Fletcher was seated in a marked police cruiser waiting to escort Phamdo to the bank. Subsequent investigation indicated that Phamdo walked to the police car and gave Fletcher his pay as a security guard. As Phamdo walked toward his car, parked next to the cruiser, a man emerged from a nearby wooded area and fatally shot Phamdo; the slug from a twenty gauge shotgun struck the victim in the chest. The assailant seized the money and fled. Virtually at the same time that Phamdo was shot, another man blew out a rear window of the police cruiser with a blast from a twelve gauge shotgun, and immediately thereafter fired a second shot which struck Fletcher in the left side of his neck, killing him. Fletcher's assailant then fled, also on foot.

## THE TRIAL

### *The Guilt Stage*

On 14 July 1983, the Grand Jury for Prince George's County returned an indictment jointly charging Kamel Ali Elfadl and Kenneth James Lodowski with the murder in the first degree of Fletcher (count 1) and of Phamdo (count 2), with the armed robbery of Phamdo (count 7) and with six offenses of conspiracy relating to those crimes (counts 3, 4, 5, 6, 8 and 9).

Following an order of the Circuit Court for Prince George's County that the defendants be tried separately,

the court transmitted the first, second and seventh counts, charging Lodowski with the murders and the robbery, to the Circuit Court for Charles County for trial.[1] Lodowski was convicted by a jury as a principal in the first degree of the murder in the first degree of Fletcher under the first count, as a principal in the second degree of the murder in the first degree of Phamdo under the second count, and of the armed robbery under the seventh count. Whereupon the Circuit Court for Prince George's County ordered that counts 3, 4, 5, 6, 8 and 9 against Lodowski be transmitted to the Circuit Court for Charles County for trial. Lodowski pleaded not guilty as to those counts and elected to be tried by the court. The evidence was presented by a stipulated set of facts. The court found Lodowski guilty of the conspiracies as charged in each of the six counts.

### The Punishment Stage

The State had served a timely notice on Lodowski that it intended to seek a sentence of death and had advised him of each aggravating circumstance upon which it intended to rely. Upon Lodowski's conviction under the first count, a separate sentencing proceeding was conducted to determine whether he was to be sentenced to death or to imprisonment for life, all as required by and pursuant to Maryland Code (1957, 1982 Repl.Vol., 1983 Cum.Supp.), Art. 27, § 413 and Maryland Rule 772A (now Rule 4–343). Inasmuch as Lodowski waived a jury sentencing proceeding, the proceeding was conducted before the Circuit Court for Charles County alone. Evidence was received and arguments heard. The court determined by a preponderance of the evidence that the mitigating circumstances did not outweigh the aggra-

---

1. The Circuit Court for Prince George's County ordered that the case against Elfadl be transmitted to the Circuit Court for Calvert County for trial. Elfadl was convicted by a jury of each of the nine counts against him. He was sentenced to six terms of imprisonment for life and to three terms of imprisonment for twenty years, to run consecutively. The judgments were reversed upon appeal to the Court of Special Appeals. *Elfadl v. State,* 61 Md.App. 132, 485 A.2d 275 (1985).

vating circumstances, and therefore the death sentence was to be imposed. Code, Art. 27, § 413(h)(2). The court imposed that sentence as to the conviction of Lodowski as a principal in the first degree under the first count of the indictment, namely that he "feloniously, wilfully and of [his] deliberately premeditated malice aforethought did kill and murder Carlton Xavier Fletcher...." [2] § 413(k)(3).

## THE APPEAL

"Whenever the death penalty is imposed, and the judgment becomes final," we are under statutory command to "review the sentence on the record." Code, Art. 27, § 414(a). *See* Md.Rule 898, entitled "Capital Cases—Review of Sentence and Appeal." Any appeal from the verdict shall be consolidated in this Court with the review of the death sentence, Art. 27, § 414(d), and it is "[i]n addition to the consideration of any errors properly before the Court on appeal," that we "shall consider the imposition of the death sentence," § 414(e). "Except as otherwise expressly or by necessary implication provided in [Rule 898], the other Rules of Chapter 800 [entitled 'Review by the Court of Appeals'] shall be applicable to proceedings in a capital case. In the event of any conflict or inconsistency between [Rule 898] and any other Rule in Chapter 800, the provisions of [Rule 898] shall prevail." Md.Rule 898 g.

Lodowski presents us with sixteen questions for review. We first look at his allegations of error concerning certain pretrial motions.

## THE PRETRIAL MOTIONS

### *The Validity of the Indictment*

Lodowski filed a pretrial motion to dismiss each and every count of the indictment on the ground that it "was

---

**2.** The court disposed of the remaining convictions by committing Lodowski to the Department of Correction for life under each of the 2nd, 5th, and 6th counts and for 20 years under each of the 7th and 8th counts, the sentences to run consecutively. It held that the 3rd, 4th, and 9th counts merged.

issued by a Grand Jury which was illegal and invalid since it was selected by a method not reasonably designed to produce a jury representation of a cross section of the community." Lodowski claims that the trial court erred in denying the motion. If Lodowski were correct, the case now before us would be at an end because there would be no charging document outstanding on which he could be tried. Md.Rule 710 (now Rule 4–201).

The Legislature has declared that it is the policy of this State that "when a person accused of a criminal offense is presented to a grand jury," he has the right to a jury "selected at random from a fair cross section of the citizens of the State who reside in the county where the court convenes." Maryland Code (1974, 1984 Repl.Vol.) § 8–102(a) of the Courts and Judicial Proceedings Article. This policy is explicated by subsection (b):

Every citizen of this State who maintains his name on the roll of voters registered for State elections has:

(1) The opportunity to serve on grand and petit juries; and

(2) The obligation to serve when summoned as a juror.

This policy is implemented by § 8–104, which provides that [t]he jury commissioner or the clerk of the court shall select the names of prospective jurors from among those persons 18 years old or older whose names appear on the voter registration lists, and from such additional sources permitted by a plan adopted under § 8–201. Volunteers for jury service shall be refused, and recommendations, if made, may not be accepted.

█ In *Wilkins v. State*, 270 Md. 62, 310 A.2d 39 (1973), *cert. denied*, 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 889 (1974), we considered and rejected the contention that a jury selected from voter registration lists did not represent a fair cross section of the citizens of the State who reside in the county where the court convenes. We looked to constitutional provisions and to decisions of the Supreme Court of the United States and other jurisdictions. We found that

[n]either the Constitution, nor the requirements of common sense, demand a scientifically perfect system for producing a representative cross section of the community. Nor has such a system been devised.... All that is required is a method reasonably designed to produce a jury representative of a cross section of the community. The objective selection of names at random from registration lists as provided for by Article 51 [of the Md.Code, now Judicial Proceedings Article, Title 8] "fully satisfies this requirement and commends itself to an impartial jury system." *Id.* at 69, 310 A.2d 39, quoting *United States v. Greenberg,* 200 F.Supp. 382, 391 (S.D.N.Y.1961).

*Colvin v. State,* 299 Md. 88, 103–07, 472 A.2d 953 (1984), is fully consistent with *Wilkins.*[3] We said in *Colvin:*

The use of voter registration lists is designed to produce an array which is a representative cross-section of the community. This official means of selecting prospective jurors is not unconstitutional even when it may have some racially disproportionate impact. *Id.* at 106, 472 A.2d 953 (footnote omitted).

We hold that the denial of the motion to dismiss the indictment was not erroneous. The indictment stands as a proper charging document on which to try Lodowski.

### The Removal of the Case for Trial

"[T]he People of the State of Maryland ... taking into [their] serious consideration the best means of establishing a good Constitution in this State for the sure foundation and more permanent security thereof" made certain declarations which are known as the "Declaration of Rights." One of these declarations, now designated as Article 20, is "[t]hat the trial of facts, where they arise, is one of the greatest securities of the lives, liberties and estate of the

---

**3.** Lodowski suggests that we reexamine the holding in *Wilkins v. State,* 270 Md. 62, 310 A.2d 39 (1973), *cert. denied,* 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 889 (1974). We are not persuaded by the reasons advanced by Lodowski to do so.

People." This principle is reflected in Article IV, § 8 of the Constitution of Maryland which now distinguishes between capital and noncapital cases. It provides:

(b) In all cases of presentments or indictments for offenses that are punishable by death, on suggestion in writing under oath of either of the parties to the proceedings that the party cannot have a fair and impartial trial in the court in which the proceedings may be pending, the court shall order and direct the record of proceedings in the presentment or indictment to be transmitted to some other court having jurisdiction in such case for trial.

(c) In all other cases of presentment or indictment, ... in addition to the suggestion in writing of either of the parties to the cause or case that the party cannot have a fair and impartial trial in the court in which the cause or case may be pending, it shall be necessary for the party making the suggestion to make it satisfactorily appear to the court that the suggestion is true, or that there is reasonable ground for the same; and thereupon the court shall order and direct the record of the proceedings in the cause or case to be transmitted to some other court, having jurisdiction in the cause or case, for trial.... The court to which the record of proceedings in such ... presentment or indictment is transmitted, shall hear and determine that cause or case in the same manner as if it had been originally instituted in that Court....

These constitutional provisions are implemented by Maryland Rule 744 (now Rule 4–254(b)).

The action against Lodowski was removed for trial from the Circuit Court for Prince George's County at the instance of the State's Attorney for Prince George's County. He suggested in writing under oath that the State could not have a fair and impartial trial in the court in which the case was pending. He prayed that the court order that counts one, two and seven, charging Lodowski with the two murders and the armed robbery, be transmitted to another court having jurisdiction. Lodowski made known to the court his belief that he could obtain a fair and impartial trial

in the Circuit Court for Prince George's County and his disagreement with the State's Attorney's suggestion that the State could not. He objected to any removal. Ultimately, the court granted the State's prayer, and, as we have seen, ordered that counts one, two and seven against Lodowski be transmitted to the Circuit Court for Charles County for trial. Lodowski urges that this was improper.

In opposing the removal, Lodowski requested a hearing on the matter. Although the State's Attorney insisted that the State had an absolute right of removal, he did not oppose a hearing. The judge conducted a plenary hearing. Defense counsel requested leave "for approximately three days in which to prepare legal pleadings in the matter." The court, however, granted the State's request for removal without further ado. He announced in open court, "I want to make my position clear in this case." He did so in this language:

> I think the State has an absolute right of removal in this case, based on the law as I understand it at the present time, and the only reason we went to hearing is that [the State's Attorney] said that he thought [the defense] was entitled to a hearing. And I don't intend to give you anymore time to file any legal pleadings. I am signing an order. I think the State has an absolute right of removal.

After further argument by defense counsel, the judge observed that defense counsel had a right to file a memorandum but that he, as judge, was "sworn to follow the law." He explained: "In my judgment the law is that I have to sign [the order for removal] right now, and I just removed the case." [4]

---

4. After Lodowski was found guilty by a jury in the Circuit Court for Charles County under the first, second and seventh counts, it appears that he made no objection to the removal of the remaining counts for trial in that court. As set out *supra*, with respect to counts three, four, five, six, eight and nine, he pleaded not guilty, and elected to be tried by the court on evidence presented by a stipulated set of facts. The court found him guilty under each of the six counts.

*The Declaration of Rights vs. the Constitution*

At the hub of Lodowski's claim of error in the removal of the three counts is that Article 20 of the Declaration of Rights and Article IV, § 8 of the Maryland Constitution are in conflict and must be harmonized. He urges that

> [t]he correct solution, and the resolution which "gives effect to" both provisions, would be to permit removal by the State in capital cases on the same basis that it is permitted in non-capital cases—the prosecution should be obligated to demonstrate to a neutral third party that it genuinely cannot obtain a fair trial in the original jurisdiction.

He asserts that "[n]o such showing was made in this case," and concludes: "Accordingly, the case should not have been removed, and [he] is entitled to a new trial."

The answer to Lodowski's contention was resolved some one hundred and twenty-five years ago. This Court said in *Baltimore v. State*, 15 Md. 376, 459 (1860):

> [W]e are to bear in mind that the Declaration of Rights is not to be construed by itself, according to its literal meaning; it and the Constitution compose our form of government, and they must be interpreted as one instrument.... The former announces principles on which the government, about to be established, will be based. If they differ, the Constitution must be taken as a limitation or qualification of the general principle previously declared, according to the subject and the language employed.

*Anderson v. Baker*, 23 Md. 531, 627 (1865), put it this way:

> As to the supposed conflict between the Constitution of Maryland and the Bill of Rights, as it is called, such a collision can scarcely occur, according to the accepted theory of the relation between these instruments. In representative constitutional governments, they are understood to be parts of a whole, constituting an entirety, and to be interpreted as one instrument. The Declaration of Rights is an enumeration of abstract principles, (or

designed to be so,) and the Constitution the practical application of those principles, modified by the exigencies of the time or circumstances of the country.

It then reiterates what was said in *Baltimore v. State* at 459: "If they differ, the Constitution must be taken as a limitation of the principle previously declared, according to the subject and the language employed." *Anderson v. Baker* concludes:

> The Declaration of Rights is a guide to the several departments of government, in questions of doubt as to the meaning of the Constitution, and "a guard against any extravagant or undue extension of power," but does not control the Constitution itself, when it is clear and unambiguous. *Id.* at 628.

The relation between the Declaration of Rights and the Constitution as set out in *Baltimore v. State* and *Anderson v. Baker* was expressly recognized in *Boyer v. Thurston*, 247 Md. 279, 295, 231 A.2d 50 (1967). The statement of the law in those cases is the law as it exists today. In short, even if Art. 20 of the Declaration of Rights be construed to be in conflict with the absolute right of removal granted either party in a capital case by Art. IV, § 8 of the Constitution, the constitutional provisions prevail.

### The Equal Protection Guarantee of the Federal Constitution

According to Lodowski, our holding that the specifics of the Constitution prevail over the generalities of the Declaration of Rights does not finally dispose of his claim of error in the removal of his case. He looks to the constitutional removal provision and urges that

> a construction of the Maryland Constitution which would permit the State a virtually unfettered right to remove the case of a capital defendant, while offering substantially greater protection against unwanted removal to a non-capital defendant, would contravene the equal protection guarantee of the Fourteenth Amendment to the Federal Constitution.

■ We first make an observation concerning Lodowski's statement with respect to the State having "a virtually unfettered right to remove the case of a capital defendant...." We note that the State and the defendant are granted precisely the same absolute right of removal in a capital case. The right to a fair and impartial trial is not a one-way street on which only a defendant may travel; the right accrues to the State as well as to the defendant. This is so even when the State seeks the extreme penalty of death. The State, equally with the defendant, is entitled to a fair and impartial trial for the determination whether the corpus delicti of a crime punishable by death was committed and whether the accused was the criminal agent, and if so whether the defendant shall be executed as the State seeks. There is no affront to equal protection when the State is afforded the same opportunity as the defendant to assure a fair and impartial trial in such instance.

We turn to Lodowski's notion that his guarantee of equal protection is contravened because the right of removal is different in capital cases than it is in noncapital cases.

■ Article 20 of the Maryland Declaration of Rights recognizes the right of an accused to be tried where the facts arise, and this State has followed as a general rule that charges must be proffered and trial must be had in the county where the crime was committed. Although there has been statutory exceptions with respect to certain crimes, *see Kisner v. State*, 209 Md. 524, 530–534, 122 A.2d 102 (1956), ordinarily a Grand Jury may not indict and a State's Attorney may not try an accused in a jurisdiction outside the county in which the offense took place. But the right is not an absolute one. It is subject, as we have seen to the removal provisions contained in the body of the Maryland Constitution. This Court's statement by way of dictum in *Kisner* at 530, 122 A.2d 102, which was repeated in *Stewart v. State*, 275 Md. 258, 272, 340 A.2d 290 (1975), that "the concept that the common law necessity for trial in the county of the commission of the crime is not a *funda-*

*mental* right or requirement" (emphasis added), was made with the observation that "[t]he Constitution of 1776 did not require and succeeding Maryland Constitutions have not required that the trial of an accused take place in the county where the crime was committed." Clearly this statement was made in the light of the right of removal, which, as we said more than three decades ago in *Heslop v. State*, 202 Md. 123, 126, 95 A.2d 880 (1953), "has been considered so essential to the administration of justice that it has been incorporated in the organic law of the State for nearly a century and a half."

■ There is no provision in the federal constitution which requires that a state trial of an accused take place in the county where the crime was committed. The Sixth Amendment to the Constitution of the United States provides, *inter alia*, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, *which district shall have been previously ascertained by law....*" (Emphasis added.) The draftsmen of the Bill of Rights specifically omitted the common law vicinage requirement as too restrictive. The provision as adopted represented a compromise which protected an individual from being tried by an alien body, but did not require a trial in the county where the crime was committed. *Williams v. Florida*, 399 U.S. 78, 93–96, 90 S.Ct. 1893, 1902–1904, 26 L.Ed.2d 446 (1970). "Under this expanded vicinage rule the individual is guaranteed a trial 'by an impartial jury of the State and district' where the crime was committed and the Legislature is given the power to define or designate the district." *People v. Goldswer*, 385 N.Y.S.2d 274, 277, 39 N.Y.2d 656, 350 N.E.2d 604, 608 (1976). In this State, under Art. IV, § 8 of our Constitution, "district" means simply "some other court having jurisdiction in such case for trial." The Maryland Legislature has not defined nor designated "district" within the contemplation of the Sixth Amendment, nor does it otherwise establish where a criminal cause shall be removed.

And Rule 744, following the language of Art. IV, § 8(b) and (c), refers to the place of removal only in terms of "another court having jurisdiction in such case for trial." Whether the difference in the right of removal between capital and non-capital cases contravenes equal protection is to be tested by the rational basis standard. Lodowski claims, however, that even under this standard, the removal provisions deny him equal protection because, he opines, there is no rational basis for the distinction between removal as to crimes punishable by death and removal as to other crimes. We do not agree. The rational basis for the distinction shines bright and clear from the history of the provisions.

The history of the constitutional removal provisions was traced by Judge Eldridge speaking for this Court in *Johnson v. State*, 271 Md. 189, 315 A.2d 524 (1974). He found that the first and only time that the distinction between capital cases and other criminal cases was made in the removal section of the Constitution was when the 1874 Legislature proposed the existing constitutional language. *Johnson* at 194, 315 A.2d 524, citing *Heslop*, 202 Md. at 126–30, 95 A.2d 880. Judge Eldridge asserted:

> [T]here is no basis in the language of the constitutional provision relating to removal, for inferring any purpose other than providing an additional procedural safeguard in a case where a criminal defendant might in fact be put to death. Art. IV, § 8, merely provides that a criminal defendant has an absolute right of removal if charged with an offense "punishable by death." *Johnson*, 271 Md. at 193, 315 A.2d 524.

He determined that

> [t]he history of the removal provision, therefore, shows a shifting concern between having a broad right of removal and having a very limited right because of the abuse associated with requests for removal. The present constitutional language resulted from a desire to narrow the right because of the abuses shown. No other intent is revealed by the historical material. *Id.* at 194, 315 A.2d 524.

Thus it is that a sufficient rational basis for the distinction between removal as to crimes punishable by death and removal as to other crimes is that the distinction has proved to be "essential to the administration of justice." We hold that the removal provisions of Art. IV, § 8 of the Maryland Constitution as implemented by Rule 744 do not offend the equal protection guarantee of the Fourteenth Amendment to the federal constitution.

### *The Motion to Suppress the Statements Made by Lodowski*

Lodowski filed a pretrial motion in the Circuit Court for Prince George's County to suppress all statements [5] made by him to the police. The court held a plenary hearing on the motion. In conducting the hearing, the court complied with the procedures and applied the law as set out by us in *State v. Kidd,* 281 Md. 32, 375 A.2d 1105, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977). At the conclusion of the hearing, the court found by a preponderance of the evidence that the statements were voluntary and denied the motion. Pursuant to this ruling, at the trial in the Circuit Court for Charles County, the court permitted the statements challenged by the motion to be submitted to the jury. It then became the jury's duty to determine, beyond a reasonable doubt, whether the statements were voluntary. Lodowski contends that the court

---

5. In this context, a statement may be a confession or an admission. As defined in *Stewart v. State,* 232 Md. 318, 323, 193 A.2d 40 (1963) [a] confession is a species of admission, that is to say, an admission that says or necessarily implies that the matter confessed constitutes a crime. An admission which is not a confession is an acknowledgment of some fact or circumstance which, in itself, is insufficient to authorize a conviction but which tends to establish the ultimate fact of guilt.

Despite this distinction, "it is firmly established that the test for the receipt in evidence against an accused is the same for a confession and an admission." *State v. Kidd,* 281 Md. 32, 34 n. 1, 375 A.2d 1105, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977). *See Miranda v. Arizona,* 384 U.S. 436, 476–77, 86 S.Ct. 1602, 1628–29, 16 L.Ed.2d 694 (1966).

erred in denying the motion and in permitting the statements to be received in evidence.

When we deal with the issue whether a statement was voluntary or involuntary, it is our duty to examine the entire record and make an independent determination of the ultimate matter of voluntariness *vel non. Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966); *Watson v. State,* 282 Md. 73, 84, 382 A.2d 574, *cert. denied,* 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978). Almost invariably in cases involving statements obtained through unobserved police interrogation, there are conflicts in the evidence as to the events surrounding the interrogations. But this Court is not a finder of facts; in the preliminary determination of voluntariness the weight initially to be given the evidence and the credibility of the witnesses are matters for the trial court. The independent constitutional appraisal which we are obliged to make means, therefore, that we accept the findings of the hearing judge with respect to the facts surrounding the interrogation unless his judgment thereon is clearly erroneous. Rule 886. We resolve for ourselves, however, in the light of the entire record, the ultimate fact, namely, the existence or nonexistence of voluntariness. *Walker v. State,* 12 Md.App. 684, 691–95, 280 A.2d 260 (1971); *Dennis v. Warden,* 6 Md.App. 295, 315, 251 A.2d 909, *cert. denied,* 255 Md. 740 (1969). If we determine, in the light of the facts and the applicable law, that the statement challenged was voluntarily made, the consideration of the statement by the trier of fact in the determination of guilt or innocence would be proper. Conversely, our determination that the statement was involuntary would ordinarily render its consideration by the trier of fact prejudicial error.

In denying the motion to suppress, the hearing judge, speaking from the bench, deemed the question to be "whether or not [Lodowski] was denied his constitutional right to counsel, that is according to everything under the Sixth Amendment of [the federal] Constitution." He made

only one finding of fact in answering the question—that Lodowski did not request a lawyer. Commenting that "I am sitting here as a trier of fact, which gives me the right to believe or disbelieve the testimony of any person that I choose to believe or disbelieve," he declared:

> I don't have any testimony from any people, that I want to believe, that I choose to believe, that he ever asked for an attorney the night in question.

He stated unequivocally what he thought was the applicable law:

> The law as I understand it to be in this State, is that the right [to counsel] is personal to [the defendant making the statement].

Shortly thereafter, he iterated his belief. Characterizing the question as "very serious," he said:

> [M]y understanding of the law is to be that the right is personal to [Lodowski] and he didn't choose to exercise it. . . .

He asserted that he did not intend to change the law. Applying the law as he thought it to be to the fact he had found, he "believed by a preponderance of the evidence that these statements are freely and voluntarily given . . . and accordingly the motion to suppress all statements is denied."

Three statements made by Lodowski were the subject of the motion to suppress. The first statement was a written admission given at 11:00 p.m. on 14 June 1983. The second statement was an oral confession obtained as a result of an interrogation which began about 10:15 p.m. on 17 June 1983 and ended shortly after 6:00 a.m. the next morning. The third statement was a written admission which was obtained immediately after the oral confession was concluded. We focus at this time on the third statement. We make our independent constitutional appraisal in the light of the following facts and circumstances.

■ The factual finding of the hearing judge that Lodowski did not request a lawyer was not clearly erroneous.

Therefore, we accept it. And we assume for the purpose of decision that, prior to the making of the third statement, Lodowski was given the *Miranda* warnings with respect to his right to a lawyer and waived, for the nonce, the right in writing by answering "yes" to the question, "Are you willing to answer questions without having a lawyer with you now?" [6] We find in the record before us certain other relevant facts regarding the circumstances surrounding the making of the third statement which stand undisputed and unrefuted.

Lodowski was in custody at the police station from 10:00 p.m. on 17 June 1983, when the police informed him that he was under arrest, until noon the next day when he was taken before a Commissioner of the District Court. During that period interrogation of him produced two statements. One was an oral confession. As recounted by the officer to whom it was made, it covered the inception of the crimes, the planning of them, their execution, the disposition of the loot and the disposal of the murder weapons. Upon the completion of the oral confession, Lodowski was presented with a form on which was typed the following:

> Kenneth you have advised me [the officer who received the oral statement] that you have information about the shooting/armed robbery that occurred at the Mini-Market on Greenbelt Rd. last Saturday evening. I would like for you to tell me about that incident.

The balance of that page and two additional pages bear a statement in Lodowski's handwriting. A fourth page is appended which according to the police, is a diagram showing where the murder weapons were thrown from the

---

6. The question was included in a "Waiver of Rights and Statements" police form on which the time of execution was stated to be 17 June 1983 at "2219 hrs." Lodowski's version was that he did not sign the form until after 12:30 p.m. on 18 June, subsequent to the making of both the oral and written statement. As we have seen, *supra,* the hearing court made no factual finding on the matter, apparently thinking that it was not necessary to do so in the light of the reason he advanced for his ruling on the motion to suppress.

Woodrow Wilson Bridge into the Potomac River. The statement bears the date "6–18–83" and the time "0618 Hrs." [7] A police officer took possession of the statement around 11:00 a.m. on 18 June at which time he requested that Lodowski sign each of the first three pages. Lodowski did so, adding the notation "signed under protest."

About 6:15 a.m. on 18 June, Lodowski's mother, who was at the police station, was informed by the police that her son was a suspect. She immediately took steps to obtain the services of a lawyer. By 7:15 a.m. she had employed two lawyers to represent her son. The lawyers arrived at the police station at 8:10 a.m., identified themselves, and asked to see and consult with their client. The request was refused. From then until noon, when Lodowski was taken before a District Court Commissioner, they made persistent efforts without avail to obtain access to their client. They solicited the aid of the Public Defender, the State's Attorney for Prince George's County and a District Court judge. They prepared a petition for a writ of habeas corpus and obtained the agreement of the judge to hear it at noon.

The police made their position perfectly clear to the lawyers, to the State's Attorney and to the judge. Their position was that since Lodowski had waived his right to counsel and had not asked for a lawyer, they were not going to allow the lawyers representing him to talk to him. The State's Attorney recounted what was told him at 9:45 a.m. when he made inquiry to the police about Lodowski. Lt. Robert Miller informed the State's Attorney that Lodowski "was being processed at that time, he had been advised of his rights by the Prince George's County Police Department, that he had not requested an attorney, and that they [the police] thought it was inappropriate to talk to counsel or to allow counsel to see Mr. Lodowski." When one of the

---

7. This is the statement which we have designated as the "third statement." A "first statement" in writing had been given by Lodowski to the police on 14 June 1983. That statement confirmed that Lodowski had shared an apartment with Elfadl. It did not implicate either Lodowski or Elfadl in the commission of the crimes.

lawyers telephoned the State's Attorney about 9:55 a.m. and asked to see his client, the State's Attorney said that he "thought the best thing would be to go ahead with his hearing [on the petition for the writ of habeas corpus], that we would have an attorney available at whatever time the Court wished to have an attorney available."

While the lawyers were attempting without success to see their client, Lodowski was writing the third statement. He was not informed by the police, nor was he aware, before he had completed the statement and signed it, that two lawyers retained by his mother to represent him were at the police station desperately attempting to see him so they could consult with him forthwith.

In a criminal cause, when the State seeks to introduce into evidence a statement given by a defendant to law enforcement officers during a custodial interrogation,[8] it must, upon proper challenge, establish by a preponderance of the evidence that the statement was voluntary. *State v. Kidd,* 281 Md. at 34, 375 A.2d 1105. A statement is voluntary in the "traditional sense" when it is obtained without force applied, coercion used, hope held out or promise made on the part of the authorities. *Abbott v. State,* 231 Md. 462, 465, 190 A.2d 797 (1963). Pertinent to the question of voluntariness is the entitlement of the defendant to the assistance of counsel during the interrogation. Contrary to the belief of the hearing judge, however, in the circumstances under which the statements were obtained from Lodowski, he was not entitled to the assistance of counsel by reason of the right to counsel clause of the Sixth Amendment to the federal constitution, even though that clause is applicable to the states through the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Sixth Amendment provides

---

**8.** *Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. at 1612 defines "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

that *"[i]n all criminal prosecutions,* the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." (Emphasis added.) Therefore, that right is applicable only upon the initiation of adversary judicial criminal proceedings, and at the time the statement was obtained from Lodowski such proceedings had not been initiated against him by way of formal charge, preliminary hearing, indictment, information or arraignment. *Webster v. State,* 299 Md. 581, 598–599 and 606, 474 A.2d 1305 (1984). *See United States v. Gouveia,* —— U.S. ——, —— - ——, 104 S.Ct. 2292, 2297–98, 81 L.Ed.2d 146 (1984).

▮ The requirement that a statement obtained from a defendant by law enforcement officers during a custodial interrogation must be voluntary in the traditional sense in order to be admissible in a criminal prosecution generally stems from that portion of the Fifth Amendment to the federal constitution commanding that no person "shall be compelled in any criminal case to be a witness against himself." *Bram v. United States,* 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). But *see Escobedo v. State of Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), impressed procedural safeguards on the traditional test of voluntariness. The procedural safeguards are warnings which must be given. The warnings are prophylactic rules created by the Supreme Court of the United States to assure the sanctity of the Fifth Amendment's privilege against compelled self-incrimination. The defendant may waive effectuation of the safeguards, but until such warnings and waiver are demonstrated by the State at trial, no evidence obtained through a custodial interrogation may be used against him. *Kidd,* 281 Md. at 36–37, 375 A.2d 1105.

▮ One of the warnings which must be given prior to any questioning is that the person has a right to the presence of an attorney, either retained or appointed. *Mi-*

*randa,* 384 U.S. at 444, 479, 86 S.Ct. at 1612, 1630. "[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege [against compelled self-incrimination] under the system we delineate today." *Id.* at 469, 86 S.Ct. at 1625.

> The presence of counsel ... would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion. *Id.* at 466, 86 S.Ct. at 1623.

"Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." *Id.* at 470, 86 S.Ct. at 1626. If the defendant indicates in any manner and at any stage of the process that

> he wishes to consult with an attorney before speaking there can be no questioning.... The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned. *Id.* at 444–45, 86 S.Ct. at 1612–13.

The right to the presence of counsel, like the other *Miranda* rights, may be waived by the defendant, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444, 86 S.Ct. at 1612. The Supreme Court "has always set high standards of proof for the waiver of constitutional rights...." *Id.* at 475, 86 S.Ct. at 1628, citing *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The Court expressly reasserted these standards as applied to in-custody interrogation and observed that the burden is on the shoulders of the State. *Miranda* 384 U.S. at 475, 86 S.Ct. at 1628. "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.*

"[W]here in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own...." *Id.* at 475–76, 86 S.Ct. at 1628–29.

*Miranda* makes clear that "[a]n individual need not make a pre-interrogation request for a lawyer.... [H]is failure to ask for a lawyer does not constitute a waiver." 384 U.S. at 470, 86 S.Ct. at 1626. The Court noted that it had stated in *Carnley v. Cochran,* 369 U.S. 506, 513, 82 S.Ct. 884, 888, 8 L.Ed.2d 70 (1962), "[I]t is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." *Id.* 384 U.S. at 471, 86 S.Ct. at 1626. The Court declared: "This proposition applies with equal force in the context of providing counsel to protect an accused's Fifth Amendment privilege in the face of interrogation." *Id.* The Court expressed a further thought with respect to waiver:

> Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. *Id.* at 476, 86 S.Ct. at 1629.

In summarizing its holdings, the Court warned: "Opportunity to exercise these rights must be afforded to [the defendant] throughout the interrogation." *Id.* at 479, 86 S.Ct. at 1630.

It is readily apparent from our scanning of the opinion of the Court in *Miranda* that the matter of the voluntariness, and thus the admissibility, of the third statement made by Lodowski is governed by the dictates of that opinion. Lodowski had the right under the Fifth Amendment privilege against self-incrimination to the assistance of counsel at the making of that statement. Thus, the question to be answered for a resolution of the motion to suppress was not as the hearing judge posed it. The proper question is whether, in the contemplation of *Miranda,* Lodowski effec-

tively waived his right to counsel with respect to the third statement.

When we consider the facts and circumstances under which the third statement was obtained in the light of the holdings in *Miranda* and the reasons advanced therefor, we are led inescapedly to the conclusion that the third statement was not voluntary. It was not voluntary because the waiver made by Lodowski was ineffective with respect to it. "Although the police punctiliously adhered to the verbal formula of the *Miranda* decision in advising [Lodowski] of [his] rights, they thereafter adopted tactics which effectively prevented or forestalled the exercise of [his] rights." *Commonwealth v. McKenna,* 355 Mass. 313, 244 N.E.2d 560, 567 (1969). "The requirement of warnings and waiver of rights is ... not simply a preliminary ritual to existing methods of interrogation." *Miranda* 384 U.S. at 476, 86 S.Ct. at 1629. The defendant must be afforded the opportunity to exercise the rights throughout the interrogation. *Id.* at 479, 86 S.Ct. at 1630. "To allow the police to use tactics which prevent or forestall a suspect from exercising his rights is inconsistent with the clear purpose of *Miranda....* Furthermore, the use of such tactics is logically incongruous with the concept of a knowing and intelligent waiver...." *Weber v. State,* 457 A.2d 674, 685–86 (Del.1983). "The *Miranda* warnings indicate to the suspect an abstract right to counsel, and the waiver of that right only means that for the moment the suspect is foregoing the exercise of that conceptual privilege." *Id.* at 685. "[W]hen a suspect's lawyer is waiting to see him, and the police do not tell the suspect of the attorney's presence and availability, then the suspect's waiver of his right to counsel is not knowing and intelligent." *Id.* at 684–85.

To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice.... A suspect indifferent to the first offer may well react quite differently to the second. *State v. Haynes,* 288 Or. 59, 602 P.2d 272, 278

(1979), *cert. denied,* 446 U.S. 945, 100 S.Ct. 2175 [64 L.Ed.2d 802] (1980).

Like observation was made in *Lewis v. State,* (Okl.Ct.Crim. App.1984) 695 P.2d 528 (1984). The court added:

> It is one thing to say a lawyer has no right to see a client; it is quite another to say that an accused person knowingly and intelligently waived his right to counsel and his right against self incrimination when it was not made known to him that his lawyer was, in effect, knocking at the jail house door. *Id.* 695 P.2d at 530.

*Weber* put it this way:

> We can not, and do not, conclude that a suspect, who is indifferent to the usual abstract offer of counsel, recited as part of the warnings required by *Miranda,* will disdain a chance to consult a lawyer waiting to see him then and there. 457 A.2d at 685.

The same reasoning was expressed in *State v. Matthews,* 408 So.2d 1274, 1278 (La.1982). And we agree with the observation in *Haynes* that "[w]hen the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity." 602 P.2d at 280. We take note that "[i]f the attorney appears on request of one's family, that fact may inspire additional confidence." *Id.* at 278.

■ To prevent a recurrence of the situation in the instant case, effectuate the protection given to the accused by *Miranda,* and ensure that a suspect has the opportunity to knowingly and intelligently waive his rights, we adopt, as a caution to law enforcement authorities and for the guidance of the trial courts, the rule established by the court in *Weber:*

> [i]f prior to or during custodial interrogation, and unknown to the suspect, a specifically retained or properly designated lawyer is actually present at a police station seeking an opportunity to render legal advice or assistance to the suspect, and the police intentionally or negli-

gently fail to inform the suspect of that fact, then any statement obtained after the police themselves know of the attorney's efforts to assist the suspect, or any evidence derived from any such statement, is not admissible on any theory that the suspect intelligently and knowingly waived his right to remain silent and his right to counsel as established by *Miranda*. 457 A.2d at 686. The rule applies whether the attorney was retained by the suspect or by a third party acting on behalf of or for the suspect or was a public defender or other lawyer designated or appointed to represent the suspect.

We have stated our view that a suspect must be fully informed of the actual presence and availability of counsel who seeks to confer with him, in order that any waiver of a right to counsel, as established by *Miranda*, can be knowing and intelligent. This view is shared, in addition to the cases above referred to, by *People v. Smith*, 93 Ill.2d 179, 66 Ill.Dec. 412, 416, 442 N.E.2d 1325, 1329 (1982); *State v. Jackson*, 303 So.2d 734, 737 (La.1974); *Commonwealth v. Mahnke*, 368 Mass. 662, 335 N.E.2d 660, 691–92 (1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1740, 48 L.Ed.2d 204 (1976); *State v. Jones*, 19 Wash.App. 850, 578 P.2d 71, 73 (1978). *Cf. Commonwealth v. Sherman*, 389 Mass. 287, 450 N.E.2d 566, 570–71 (1983). And *see Burbine v. Moran*, 753 F.2d 178 (1st Cir.1985).

The cases above which we have cited and extensively quoted represent a clear majority of the courts which have considered the issue. Other cases have in effect shared our view but have adopted an even more stringent rule—once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, *in the presence of the attorney*, of the defendant's right to counsel. *See State v. Johns*, 185 Neb. 590, 177 N.W.2d 580, 585 (1970); *People v. Hobson*, 384 N.Y.S.2d 419, 420, 39 N.Y.2d 479, 348 N.E.2d 894, 896 (1976); *People v. Arthur*, 292 N.Y.S.2d 663, 666, 22 N.Y.2d 325, 239 N.E.2d 537, 539 (1968). We do not subscribe to that rule.

The few cases under comparable facts which are not in full accord have disregarded the question of the validity of the waiver and relied upon the totality of the circumstances in determining whether a statement was voluntary, *see, e.g., State v. Blanford,* 306 N.W.2d 93, 96 (Iowa 1981); *State v. Smith,* 294 N.C. 365, 241 S.E.2d 674, 680–81 (1978).

The reasoning of the majority of the courts in other states faced with analogous circumstances to those in the case before us is persuasive and convinces us that the conduct of the police vitiated Lodowski's waiver of his right to counsel with respect to his third statement. Therefore, that statement was rendered involuntary and inadmissible in the State's case in chief. The conduct of the police, even if predicated upon a mistaken concept of the law, had the effect of circumventing Lodowski's rights. "No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, his rights." *Matthews,* 408 So.2d at 1278. We hold, as to the third statement, that the denial of the motion to suppress was prejudicial error which requires reversal of the judgments entered at the jury trial under the first, second and seventh counts of the indictment.

For the same reason the judgments entered at the court trial on the third, fourth, fifth, sixth, eighth and ninth counts of the indictment are reversed. As we have seen, those charges were tried on a stipulated set of facts. The facts stipulated with regard to the conspiracies included the statements of Lodowski "as presented at the trial for counts one, two, and seven (although Defendant Lodowski wishes to preserve his objections to the admissibility of this evidence)." Thus, our determination that the denial of the motion to suppress the third statement was erroneous requires that the judgments on the conspiracy counts also be set aside.

The State suggests that "[e]ven if this Court holds that a waiver in general terms is not effective when specific counsel is available, or determines that the failure to advise

[Lodowski] of the availability of a specific attorney renders the State's proof of waiver insufficient, any error in admitting the statements in this case was clearly harmless beyond a reasonable doubt." The third statement was an admission as distinguished from a confession, *see* n. 5 *supra,* but it was inculpatory and buttressed the oral confession, lending credence to the confession in a way that was not insignificant. It dealt with Lodowski's relationship with Elfadl prior to the commission of the crimes, Elfadl's purchase of a shotgun and Elfadl's persistent solicitation of Lodowski to rob the Minimart. Although Lodowski began to write it before his attorneys knocked at the stationhouse door, it appears that he had not completed it when they arrived and initially attempted to consult with him. He did not sign it or turn it over to the police until several hours after his attorneys were first denied access to him. In such circumstances, the fact that the third statement was in some respects "cumulative" is not controlling. A question of credibility is ever present when a statement is offered, and particularly so with respect to an oral statement recounted by a police officer and made during an unobserved interrogation. A signed statement in a defendant's handwriting is more compelling evidence of what the defendant said than the testimony of a police officer of what the defendant said. A defendant who has written and signed an inculpatory statement has a far heavier burden to meet to establish that he was actually not involved in the commission of the crime than if his statement were oral. *See Elfadl v. State,* 61 Md.App. 132, 138, 485 A.2d 275 (1985). Upon our own independent review of the record, we are not able to declare a belief, beyond a reasonable doubt, that the error in denying the motion to suppress the third statement "in no way influenced the verdict." We are not satisfied that "there is no reasonable possibility that [the statement admitted] ... may have contributed to the rendition of the guilty verdict." *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976). We hold that the error in denying the motion to suppress as to the third statement was not harmless.

We do not reach on this appeal the question whether the oral confession was admissible. There were numerous conflicts in the evidence with respect to the circumstances under which it was obtained. For example, it was disputed whether the waiver was signed on 17 June 1983 at 10:19 p.m. as the police indicated, or not until after 12:30 p.m. on 18 June as Lodowski maintained, so as to be after both the oral confession and the third statement were given. The evidence differs as to what Lodowski and his mother were told from time to time by the police as to Lodowski's status as a suspect or a witness and his need for an attorney. Due to the length of the interrogation and the tactics employed by the police, it was disputed whether Lodowski was capable of freely and knowingly waiving his rights. A psychiatrist, offered as an expert witness, gave his opinion, based upon a personal examination of Lodowski, the oral confession, the testimony he heard in court, and Lodowski's "sleep deprivation state" when the confession was made. He opined that the confession was not the product of Lodowski's unconstrained choice. As we have seen, none of these matters were resolved by factual findings of the hearing judge. Such findings are necessary for our independent constitutional appraisal of the voluntariness of the confession.

Nor do we decide the admissibility of the first statement. Its voluntariness depends primarily upon whether it was the product of a custodial interrogation. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630. The hearing judge made no factual finding whether the first statement was volunteered or was extracted after an effective waiver by an interrogation while Lodowski was in custody. If the first statement is proffered by the State on retrial and challenged, the court shall make factual findings on the record appropriate to our independent constitutional appraisal with respect to its voluntariness. *Jackson v.*

*Denno,* 378 U.S. 368, 390–391, 84 S.Ct. 1774, 1788–1789, 12 L.Ed.2d 908 (1964); Md.Rule 736f (now Rule 4–252(f)).

Lodowski is entitled to a new trial. He may not, however, relitigate the issues determined by the holdings we make today on the pretrial motions, namely the validity of the indictment, the removal of the case for trial, and the suppression of the third statement. Those holdings are the law of the case and are conclusive on retrial.

## THE OTHER QUESTIONS PRESENTED

Ordinarily, by reason of our reversal of the judgments, we would not reach the other questions presented by Lodowski. But on occasion this Court has expressed its views with respect to certain matters even though their resolution had become unnecessary for the immediate decision. We have done so for the guidance of the court below on retrial or to indicate to trial judge, the State and defendants our thinking regarding the law and rules of conduct on matters of important public concern. *See Jones v. State,* 302 Md. 153, 486 A.2d 184 (1985). While what we say in this posture may be characterized as *obiter dicta,* we feel an urgency to speak in the hope of avoiding the burden of further appeals with respect to the issues discussed.

### *The Evidence Concerning an "Unrelated Crime"*

At the guilt stage of the trial, the court, over challenge, admitted into evidence the testimony of one Kenneth Ferber, an acquaintance of Lodowski.[9] Ferber testified that about a month before the crimes were committed at the Minimart, Lodowski asked him if he wanted to make some money.

I asked him how. He asked if I wanted to do a job with him. I asked him, you know, what he was talking about,

---

**9.** Ferber's testimony went before the jury at the trial on the first, second and seventh counts of the indictment. It was included in the facts as stipulated, with the objection of Lodowski preserved, in the court trial on the remaining counts.

and he went over to his couch, and he pulled out a sawed-off shotgun which he pumped—

\*　　\*　　\*　　\*　　\*　　\*

Well, I asked him what he was going to do. You know, he wouldn't tell me. He wouldn't tell me anything. He wanted to know if I was in or out. You know, as soon as I knew it had something to do with that kind of thing, I said, "What, are you crazy or something?" 'cause I didn't want to be involved in anything like that.

Then, after that, I just, you know, I kept asking him what, you know, what was going to happen, what he was going to do. He kept on asking me if I was in or out, he kept on giving me information, like. I said, "What, are you going to shoot somebody or something?" He said, "Maybe." When he said that, that freaked me out, cause I never thought that Kenny would ever, you know, could ever hurt anyone, but after—after he said that, I just kept questioning him, you know. He kept on saying, "Are you in or out?" I said, "Who are you going to shoot?"

Also, he asked me—I asked him what he would, you know—if I'm in, what will I have to do. He said, just hold a gun while somebody threw money to him in a bag. Okay.

So then, after that, he asked me if I was in or out again, and I asked him—let me think. I said, "What, are you going to shoot somebody?" Like I said before, he said he might have to shoot a security guard that was sitting in a—that would be sitting in a car at the scene.

\*　　\*　　\*　　\*　　\*　　\*

Then I said, "Where is it?" ... I just kept on asking him locations. He said that—it came to Virginia and a liquor store, is what I finally got out of him.

There was no other evidence concerning the perpetration of such a crime in Virginia.

The testimony of Ferber was challenged by a motion *in limine* which was heard at the bench. Defense counsel

argued that the contemplated crime which was the subject of Lodowski's conversation with Ferber was not the same crime for which Lodowski was being tried. The defense observed that if Lodowski was talking "about a situation involving the death of a police officer, if that's confined to a liquor store in Virginia, I think we have one situation; if it's confined to the Minimart in Greenbelt, then I think we have another situation." The State's Attorney stated his position:

> Anybody who has a conversation with anybody about killing a police officer, and subsequently is charged with the crime of killing a police officer anywhere in this country, I think that type of testimony would be, in fact, admissible as to his state of mind, if nothing else, at that particular time.

The judge had indicated that "I'll let [Ferber] testify to anything concerning a place where a police officer was." The judge in ruling on the motion expressly assumed that Lodowski was talking about a liquor store in Virginia. The judge asked: "Why isn't [the conversation] relevant, if [Lodowski's] ultimate purpose was the Minimart, and he's just feeling [Ferber] out?" In denying the motion *in limine* the judge made no express findings of fact and did not give the reasons or state a rule of law in support of his decision.

The State now suggests that "considering both that the witness had declined to participate by the time the locale was revealed and that the *modus operandi* here was identical to that described, it is readily inferable that [Lodowski] was describing the instant offense and not a Virginia crime, especially when the nexus in time is considered." If this was indeed a rational inference from the evidence, the judge did not so find on the record. The challenged testimony indicated that Lodowski was considering committing a crime similar to that committed at the Minimart. Whether he was in fact referring to the Minimart crime or to a different crime was for the determination of the trial judge. If the subject of the conversation was the Minimart crime,

the testimony may have been admissible as a voluntary extrajudicial admission. *Foster v. State,* 297 Md. 191, 210, 464 A.2d 986 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *Johnson v. State,* 38 Md.App. 306, 314, 381 A.2d 303 (1977), citing *Md. Paper Products Co. v. Judson,* 215 Md. 577, 590, 139 A.2d 219 (1958).

■ If the conversation concerned a crime other than the Minimart, the question is whether it would be admissible under an exception to the rule that evidence of a defendant's prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial. *See Straughn v. State,* 297 Md. 329, 333, 465 A.2d 1166 (1983); *Tichnell v. State,* 287 Md. 695, 711–712, 415 A.2d 830 (1980); *Cross v. State,* 282 Md. 468, 473–474, 386 A.2d 757 (1978); *Ross v. State,* 276 Md. 664, 669–670, 350 A.2d 680 (1976). Assuming that the crime discussed was not the Minimart offense, we point out that the record here is devoid of evidence that the crime was in fact committed. Furthermore, if it were committed, Lodowski's involvement in such an uncharged crime must be established by clear and convincing evidence. *Cross* 282 Md. at 478, 386 A.2d 757. Even upon such proof the trial judge may exclude such evidence if in his discretion the potential prejudice to the defendant outweighs its probative value. *Straughn* 297 Md. at 333–334, 465 A.2d 1166; *Cross* 282 Md. at 474, 386 A.2d 757.

■ If, on retrial, Ferber's testimony is proffered and challenged, the trial judge should make, on evidence relevant to the issue, factual findings pursuant to procedures set out in *Cross* at 478 n. 2, 386 A.2d 757. These findings should be made in the light of the applicable law governing the admissibility of such evidence. And it would be better if he spread on the record the reasons for his ruling on the challenge.

### The Death Sentence

Our reversal of the judgment on the first count of the indictment charging murder in the first degree wipes out, of

course, both the conviction thereunder and the sentence imposed thereon. But even if the conviction were valid, we would have to vacate the sentence because of errors committed by the court in the sentencing proceeding. We now consider certain of those errors.

### Aggravating Circumstances

In imposing the death sentence under the conviction of murder in the first degree charged in the first count of the indictment, the court found, beyond a reasonable doubt, two aggravating circumstances. One of them was that "[t]he victim was a law enforcement officer who was murdered while in the performance of his duties." Md.Code (1957, 1982 Repl.Vol.) Art. 27, § 413(d)(1). *See* Md.Rule 772A. The court found, by a preponderance of the evidence, only one mitigating circumstance, that Lodowski had not previously been found guilty of a crime of violence. Section 413(g)(1)(i). The court determined, by a preponderance of the evidence, that the mitigating circumstance did not outweigh the aggravating circumstances, § 413(h)(1), obliging it to impose the sentence of death, § 413(h)(2). The court imposed that sentence. § 413(k)(3). Lodowski claims the court was wrong in finding as an aggravating circumstance that the victim, Carlton X. Fletcher, was in the performance of his duties as a law enforcement officer when he was murdered.

The fact that "[t]he victim was a law enforcement officer who was murdered while in the performance of his duties" is established as an aggravating circumstance by § 413(d)(1) of the death sentence statute. With certain additions not here relevant, § 413(e)(3) adopts the meaning of "law enforcement officer" as that prescribed in Art. 27, § 727. Under § 727 "law enforcement officer" includes "any person who, in his official capacity, is authorized by law to make arrests" and who is a member of "[t]he police department, bureau, or force of any county." § 727(b)(3). The meaning of "law enforcement officer" set out in § 727 does not, however, include a "security officer" privately em-

ployed or a "special officer" within the contemplation of Art. 41, §§ 60–70. *See* Art. 27, § 594B(f)(8); *Huger v. State,* 285 Md. 347, 402 A.2d 880 (1979).

At the time of his death, Fletcher was a member in good standing of the Prince George's County Police Department. As such he was obliged "to exercise full police authority on all land, water and air within the territorial limits of the County...." Prince George's County, Md.Code § 18–142(b) (1983). It is apparent that he was a "law enforcement officer" within the meaning of the death penalty statute, Art. 27, § 413(d)(1). When the crimes were committed, Fletcher was on annual leave. The Chief of Police for Prince George's County testified that departmental rules and regulations allowed officers "to work on an off-duty status up to 16 hours per week, and unlimited on their own time, which would include annual leave." He indicated that the officers are "permitted to work in uniform, and use police cruisers, and carry their service revolvers...." Many of them work off-duty as security guards for private industry. They do not need departmental approval to accept such employment. Thus, Fletcher's private employment as a security guard was not prohibited and did not affect his status as a law enforcement officer. The question is whether he "was murdered while in the performance of his duties" *as a law enforcement officer.* If he were, that fact would be an aggravating circumstance in consideration of a death sentence. If he were not, his status as a law enforcement officer in itself would not be sufficient to comprise an aggravating circumstance.

██ Section 18–163 of the Prince George's County, Md., Code (1983) provides:

Members of the Police Department are held to be always on duty, although periodically relieved from the routine performance thereof. They are subject at all times to order from the proper authorities and to call by citizens. The fact that they may be off duty shall not be held as relieving them from the responsibility of taking proper

police action in any matter *coming to their attention* requiring such action. (Emphasis supplied).

In *Police Comm'r v. King,* 219 Md. 127, 148 A.2d 562 (1959) we discussed the terms "while on active duty," "while in the actual performance of duty," and "while in the discharge of duty" with respect to members of the Baltimore City Police Department. Being on duty was a requisite for the payment of benefits from certain trust funds when a member of the Department was killed or injured. We thought that "the words 'while on active duty' refer to the nature and character of the duty being performed by a policeman at the time of his death or injury rather than to his general status in the Department." *Id.* at 132–133, 148 A.2d 562. We held that "a policeman is on 'active duty' ... at all times when he is actually and in fact discharging his duties as a police officer." *Id.* We cautioned: "There must be some causal connection between the death or injury and the deceased's duty as a policeman." *Id.* That conclusion, we declared "renders the words 'while on active duty' ... the equivalent of 'while in the actual performance of duty' and 'while in the discharge of duty.'" *Id.* We think that this reasoning is appropriate to the words "in the performance of his duties" as used in the aggravating circumstance provision of the death penalty statute. We believe that the words "in the performance of his duties" as used in the aggravating circumstances provision of the death penalty statute means when the police officer is actually and in fact discharging his duties as a police officer. This view makes the determination of whether a police officer is "in the performance of his duties" a question of fact. We, therefore, look to see if the trial court's finding that Fletcher was in the performance of his duties when he was murdered was clearly erroneous. Rule 886. Again we do not have the benefit of an expression on the record of the court's reasons for its finding.

At the outset we reject the State's theory that, under § 18–163 of the Prince George's County Code, the commission of a crime in the presence of a police officer is

sufficient in itself for the sentencing court to find beyond a reasonable doubt that an off-duty police officer reverted immediately to an on-duty status. This theory overlooks the qualifying clause in § 18–163 which provides that the responsibility of off-duty police officers to take proper police action is limited to "any matter *coming to their attention* requiring such action." (Emphasis added).

The State agrees that "the question of whether a law enforcement officer is acting 'in the performance of his duties' is a factual determination...." And we agree with the State that such determination is "not settled by either the fact that the officer is off duty or has undertaken private employment to supplement his income." Rather the question is to be decided on the particular facts of each case.

The record is devoid of competent evidence legally sufficient for the sentencing judge or jury to find, beyond a reasonable doubt, that any matter requiring Fletcher, as a member of the Prince George's County Police Department, to take proper police action had come to his attention before he was killed. *See* § 18–163 of the Prince George's County Code. On the contrary, the evidence indicates that Fletcher was unaware at the time he was killed that crimes were being committed in his presence. The State concedes that "the murders [of Phamdo and Fletcher] followed so closely in time that Fletcher did not even have the opportunity to put down his pay envelope or unholster his weapon...." Since the evidence was not sufficient to establish beyond a reasonable doubt that the crimes had come to his attention before he was killed, it follows that Fletcher had not reverted from his status as a private security guard to the status of a law enforcement officer so as to take any action in the performance of his duties.

The State suggests that "a finder of fact could infer from the circumstances that the beginning of the robbery and the shooting of Phamdo in the presence of Fletcher shifted Fletcher's responsibilities from a private security guard to a

law enforcement officer." It opines that "[t]his inference is especially appropriate" because Fletcher was dressed in his police uniform and sitting in a marked police car. Further, the State avers, Elfadl knew from his previous employment at the Minimart that Fletcher was in fact a police officer and that the murder "was effectuated precisely to preclude [Fletcher] from succeeding in any law enforcement efforts." These facts are not relevant. The test with respect to whether Fletcher was in the performance of his duties as a police officer when he was murdered is not whether Lodowski and Phamdo knew that Fletcher was a police officer, but whether Fletcher knew that an act had occurred or was occurring which obliged him to take proper police action. It follows from all of the above that the sentencing court was clearly erroneous in its judgment that Fletcher was murdered while in the performance of his duties as a law enforcement officer. Rule 886.

■ Lodowski also urges that the sentencing court erred in receiving certain evidence on the issue. The Chief of Police for Prince George's County was asked to tell the court "based upon your professional opinion, whether or not when ... Fletcher was killed or was shot, whether he was on duty, in your opinion?" Objection was overruled. The Chief opined:

> Based on the information that I'm aware of, at the time a gunshot was heard, the man fell beside the cruiser. Officer Carlton Fletcher would have reverted to an on-duty status, merely by the fact that a gunshot had been fired, injury had been inflicted; later, of course, it was a homicide. The shooting by and of itself would put him on an on-duty status at that point in time.

In *Franceschina v. Hope,* 267 Md. 632, 642–643, 298 A.2d 400 (1973), we quoted with approval from E. Morgan, *Basic Problems of Evidence,* at 218 (1962). Professor Morgan said that a witness may not "in the guise of opinion upon a matter of fact include in it a matter of law or the application of a rule of law to the facts." He continued:

> When a standard of a measure or a capacity has been fixed by law, no witness whether expert or non-expert, nor however qualified, is permitted to express an opinion as to whether or not the person or conduct in question measures up to that standard. 267 Md. at 643, 298 A.2d 400.

That question, we noted, is for the trier of fact. *Id.* Despite the State's argument to the contrary, it is apparent that the Chief was applying the law as he believed it to be to the facts as he knew them to reach the conclusion that Fletcher was in the performance of his duties as a law enforcement officer when he was murdered. This was a matter for the trier of fact. The Chief's testimony was not admissible.

In support of its contention that Fletcher was murdered while in the performance of his duties as a law enforcement officer, the State was permitted to introduce, over objection, documents evidencing uncontested claims for and approvals of monetary awards to Fletcher's widow and children by various agencies authorized to make such awards with respect to police officers killed in the line of duty. The documents indicated that the awards were made on the basis that Fletcher was killed while in the performance of his duties as a police officer. They included a workmen's compensation death claim and award, a claim filed with and an award granted by the United States Law Enforcement Assistance Administration pursuant to the Public Safety Officers' Death Benefits Act of 1976 (42 U.S.C. § 3796 *et seq.*), and a claim made and approval of an award made pursuant to Maryland Code (1957, 1982 Repl.Vol.) Art. 41, § 59A–1, which provides for the payment of a cash benefit to the survivors of a law enforcement officer killed in the line of duty. The evidence also included documents accompanying the various claims. These consisted of the opinion of a former Chief of Police of Prince George's County, a letter from the County Attorney to the Police Department, a letter from the Chief of Police to the Secretary of State, and an affidavit from Fletcher's widow, all to the effect

that Fletcher died as a result of gunshot wounds received in the line of duty.

The awards here fall within the rationale of the rule that "[a] judgment rendered in a civil case is not admissible in a criminal prosecution as evidence of the facts determined by such judgment because the parties are different, and because the quantum of proof required in a civil case is less than that required in a criminal one." 3 *Wharton's Criminal Evidence* § 654 (C. Torcia, 1973, Cum. Supp.1984). In urging that the evidence was admissible, the State seizes on the exception stated by Wharton: "[W]here the judgment is offered to prove a collateral fact in the case, and not to show guilt or innocence, it may be allowed in evidence." *Id.* It is true that the evidence was not offered to show Lodowski's guilt or innocence. But it was offered in the sentencing stage of the trial to establish an aggravating circumstance necessary to the imposition of a sentence of death. By no stretch of the imagination could the existence of an aggravating circumstance under the death penalty statute be considered a fact collateral to the main issue, namely, whether the defendant is to be executed. The evidence here of the claims and awards with their documentation does not come within the exception relied on by the State. It is our view that the evidence was inadmissible and that the court erred in overruling the objection to it.

### Victim Impact Evidence

Victim impact evidence was admitted over objection at the sentencing proceeding. The evidence consisted of a written statement by Fletcher's widow, a written statement by Phamdo's mother with a picture of her family, a written statement signed by members of Phamdo's family, all of which were part of a presentence investigation report by the Division of Parole and Probation. There was also oral testimony by Fletcher's widow and Phamdo's mother. The statements and testimony described in graphic detail the adverse impact the murder of each victim had on his respec-

tive family. It seems that the written statements were originally submitted to the Prince George's County Victim Impact Unit and thereafter turned over to the Division of Parole and Probation.

Some years ago the legislature required that the Division of Parole and Probation provide the judge of a court with a presentence investigation:

1) in all cases when requested by any judge. Md.Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.) Art. 41, § 124(b);

2) "[p]rior to the sentence by the circuit court of any county to the jurisdiction of the Division of Correction of a defendant convicted of a felony, or a misdemeanor which resulted in serious physical injury or death to the victim ... unless the court specifically orders to the contrary in a particular case." § 124(c)(1).

Victim impact evidence was first afforded statutory recognition in 1982. Acts 1982, Ch. 494 provided that a presentence investigation shall include a victim impact statement if:

1) The defendant, in committing a felony, caused physical, psychological, or economic injury; or

2) The defendant, in committing a misdemeanor, caused serious physical injury or death to the victim. Art. 41, § 124(c)(2).

"If the court does not order a presentence investigation, the State's Attorney may prepare a victim impact statement to be submitted to the court and the defendant...." § 124(c)(2)(ii). "The court shall consider the victim impact statement in determining the appropriate sentence...." § 124(c)(2)(iii).

Chapter 494, Acts 1982, codified as Art. 41, § 124(c)(3), required that "[a] victim impact statement shall

(i) Identify the victim of the offense;

(ii) Itemize any economic loss suffered by the victim as a result of the offense with its seriousness and permanence;

(iii) Identify any physical injury suffered by the victim as a result of the offense along with its seriousness and permanence;

(iv) Describe any change in the victim's personal welfare or familial relationship as a result of the offense;

(v) Identify any request for psychological services initiated by the victim or the victim's family as a result of the offense; and

(vi) Contain any other information related to the impact of the offense upon the victim that the court requires.

The next year the legislature expressly tied together victim impact evidence and capital cases. Acts 1983, Ch. 297, effective 1 July 1983, reenacted Art. 41, § 124 and added subsection (d) which declared that

[i]n any case in which the death penalty is requested ..., a presentence investigation, including a victim impact statement, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Art. 27, § 413.

Acts 1983, Ch. 345 added paragraph (4) to subsection (c) of § 124. Paragraph (4) provided:

If the victim is deceased, under mental, physical, or legal disability, or otherwise unable to provide the information required [for the victim impact statement] the information may be obtained from the personal representative, guardian, or committee, or such family members as may be necessary.

Chapter 345 also inserted "or the victim's family" in subparagraph (vi) of paragraph (3) in subsection (c).[10]

---

**10.** The statutory provisions concerning presentence investigation are implemented by Md.Rule 771 (now Rule 4–341) but the Maryland Rules do not speak to victim impact statements. Sentencing procedures, set out as to non-capital cases in Rule 772 (now Rule 4–342) and as to capital cases in Rule 772A (now Rule 4–343) contain no reference to such statements.

(1)

Lodowski first attacks the admission of victim impact evidence in general. He contends that it is "per se inadmissible in a capital proceeding...." He urges that "[t]o the extent that Art. 41, § 124 permits or mandates victim impact evidence in capital proceedings, it is unconstitutional." But he does not point directly to any constitutional right which the admission of such evidence violates or to any constitutional guarantee which it offends. Rather, he talks in terms of the admission of such evidence as injecting "an arbitrary factor." This may, perhaps, implicate due process. He refers, however, to a statute Art. 27, § 414(e)(1), to support his position. The statute commands this Court on review to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." Clearly the legislature did not believe that victim impact evidence was an arbitrary factor. As we have seen, it has expressly authorized consideration of such evidence in non-capital cases, and required its consideration in capital cases. We again observe that the statute so providing, Art. 41, § 124, was reenacted in 1983 in the face of Art. 27, § 414(e)(1) which related to "arbitrary factors."

The legislature has spelled out the types of evidence that are admissible in a capital sentencing proceeding. "Any presentence investigation report" is admissible except for "any recommendation as to sentence contained in the report...." Code, Art. 27, § 413(c)(iv). As we have seen, as of 1 July 1983, a presentence investigation must be completed by the Division of Parole and Probation in any case in which the death penalty is requested and that investigation must include a victim impact statement, which shall be considered by the court or jury before whom the sentencing proceeding is conducted. Art. 41, § 124(d). Art. 27, § 413(c)(iv) was reenacted in 1983 to be effective on the same date as Art. 41, § 124(d). Acts 1983, Ch. 497. It is apparent that the legislature intended that victim impact statements be admissible in capital case sentencing proceed-

ings. Furthermore, the legislature declared admissible "[a]ny other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements." Art. 27, § 413(c)(v).

The Supreme Court has recognized that "a heavy burden rests on those who would attack the judgment of the representatives of the people." *Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976) (plurality opinion).

> [W]hile we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators.
>
> \* \* \* \* \* \*
>
> This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. *Id.* at 174–175, 96 S.Ct. at 2925–2926.

The plurality opinion observed:

> The deference we owe to the decision of the state legislatures under our federal system ... is enhanced where the specification of punishments is concerned, for "these are peculiarly questions of legislative policy." *Id.* at 176, 96 S.Ct. at 2926, quoting *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958)(citation omitted).

For like reasons, we owe the same deference under our State system to the General Assembly of Maryland.

In *Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983), we had occasion to consider a variety of attacks on constitutional grounds on our death penalty laws. One of the attacks was directed at Art. 27, § 413(c). Calhoun claimed that the section rendered the death penalty in Maryland unconstitutional because of its broad provisions as to evidence which the sentencing authority is to consider in reaching its decision to impose either the death penalty or life imprisonment.

*Id.* at 630, 468 A.2d 45. We noted that "the sentencing authority in a capital punishment case ought to be provided all relevant information." *Id.* at 631, 468 A.2d 45, citing *Johnson v. State*, 292 Md. 405, 443, 439 A.2d 542 (1982). We reviewed the Supreme Court cases on the matter and found that they state that the exercise of discretion by a sentencing authority "is permissible as long as that exercise is conducted within the confines and in compliance with the standards of a 'carefully drafted' capital sentencing statute." *Calhoun,* 297 Md. at 634–635, 468 A.2d 45. We said that "Maryland's statute ... falls within the Supreme Court's prescription for a statute that provides sufficient guidance and opportunity for channeled discretion to the sentencing authority." *Id.* at 635, 468 A.2d 45.

*Calhoun* did not consider Art. 27, § 413(c) in the light of victim impact statements being included in presentence investigation reports. But we do not believe that the inclusion of such statements in the types of evidence declared to be admissible by the legislature in a capital sentencing proceeding affects our determination declared in *Calhoun* that § 413(c) is constitutional. We found that decisions of the Supreme Court indicate an accord with our view, *see Calhoun* at 631, 468 A.2d 45; *Johnson* 292 Md. at 443, 439 A.2d 542, that "*all* relevant information, positive as well as negative, is admissible during the sentencing proceeding." *Calhoun* 297 Md. at 619, 468 A.2d 45 (emphasis in original). We see no constitutional impediment to the legislature's determination that victim impact statements are relevant in a capital sentencing proceeding, and we bow to the legislative judgment that such statements are relevant.[11] Since they are relevant they do not constitute an arbitrary factor.

---

11. The facts and circumstances of the instant case give rise to the question whether evidence of the impact Phamdo's murder had on Phamdo's family is relevant to a determination of the sentence to be imposed on Lodowski upon his conviction of murdering Fletcher. In other words, in a sentencing proceeding to that end, must impact evidence be confined to that which relates to the impact Fletcher's

According to Lodowski this Court in *Henry v. State*, 273 Md. 131, 150, 328 A.2d 293 (1974) emphasized that "the sentence should be fashioned, to the best of the sentencing judge's ability, to the facts and circumstances surrounding the crime and the individual then being sentenced." He posits that victim impact evidence does not relate to either of those matters. Thus, he would have us declare that victim impact statements are inadmissible despite the legislature's directives to the contrary. We understand that before the legislative enactments concerning victim impact statements, it was not uncommon for the State's Attorney in at least five of the larger jurisdictions in this State to submit such statements for the court's consideration in imposing sentence. These statements were usually completed by a county Victim Impact Unit. We do not believe that the language in *Henry* either then or now prohibits the sentencing authority's consideration of a victim impact statement. We think that Lodowski construes the phrase "the facts and circumstances surrounding the crime" too narrowly. In *Henry* we accepted as a correct exposition of the law that the scope of a sentencing judge's inquiry in imposing sentence is sufficiently broad to permit him to consider the gravity of the offense for which the defendant was convicted. 273 Md. at 147–148, 328 A.2d 293. Early on this Court observed: "If the circumstances accompanying a crime are of unusual aggravation the punishment ought to be unusually severe." *Mitchell v. State*, 82 Md. 527, 534, 34 A. 246 (1896). *See Toomer v. State*, 112 Md. 285, 294, 76 A. 118 (1910). We believe that there is a reasonable nexus

---

murder had on Fletcher's family? This issue was not raised by Lodowski below or on appeal and we do not now address it. Md.Rule 885. We shall do so when we have a case presenting the issue to us properly, that is, tried and decided below and briefed and argued on appeal.

Of course in no event may the sentencing court or jury consider victim impact evidence as an aggravating circumstance. *See* Maryland Code (1957, 1982 Repl.Vol., 1984 Cum.Supp.) Art. 27, § 413(d). It is clear from the record here that the sentencing court did not do so.

between the impact of the offense upon the victim or the victim's family and the facts and circumstances surrounding the crime especially as to the gravity or aggravating quality of the offense. We are in accord with the court's analysis in *Sandvik v. State,* 564 P.2d 20 (Alaska, 1977). In that case the court said:

> We believe that the presentence report should contain basic information pertaining to the victim or victims of the crime. For the sentencing court cannot accomplish the full panoply of penal objectives ... by sentencing in an informational vacuum. Generally the victims of anti-social conduct should be considered in the sentencing process, especially in cases where there is a specific intent on the part of the offender to harm a particular individual or individuals. Clearly information regarding such victims is encompassed within the objective of providing the sentencing court with "a complete description of the offense and the circumstances surrounding it" [12] in the presentence report.

* * * * * *

[T]he impact of the crime on the victim is a relevant circumstance surrounding the commission of the offense and thus can properly be included in the presentence report. *Id.* at 23.

(2)

In the second phase of Lodowski's attack on victim impact evidence he contends that

---

**12.** The court was quoting from *ABA Compendium of Model Correctional Legislation and Standards,* Probation Standards § 2.3(ii)(A) (1972, Supp.1975) with respect to the presentence report.

Except as to a victim impact statement, we find no Maryland statute, published rule or regulation which delineates the contents of a presentence report. Presentence reports completed by the Division of Parole and Probation, however, invariably contain a detailed description of the crime and the circumstances surrounding it as did the presentence investigation report in the instant case.

[a]ssuming the admissibility of the written victim impact statements in this case, it was error to allow the additional live testimony of the victims' survivors.

He reasons that, since Art. 41, § 124(c) and (d) provides for a victim impact statement—and "clearly imports that the statement submitted is to be written"—and since § 124(c) and (d) does not provide for use of live witnesses, live testimony is precluded. He "submits that it was not the legislative intention to permit live victim impact testimony." We do not agree.

Unquestionably, the presentence reports for which § 124 provides are to be written. It is equally clear that live testimony is not specifically authorized. We do not think, however, that these facts demonstrate a legislative intent to preclude live testimony. Section 124 is concerned only with victim impact evidence that is submitted to the court or jury by way of a statement included in a presentence investigation report. It does not follow that because a victim impact statement under the section must necessarily be in writing and included in or made a part of a presentence investigation report, victim impact evidence may not be submitted by testimony. While § 124 does not expressly authorize the submission of such evidence by other means, neither does it prohibit the use of live testimony. It simply does not deal with the question whether victim impact evidence may be placed before the sentencing authority orally. The legislative intent suggested by Lodowski—to preclude live victim impact testimony—is not apparent from the language and provisions of the statute.

This Court has long recognized the broad discretion of a sentencing judge. We said in *Bartholomey v. State*, 267 Md. 175, 193, 297 A.2d 696 (1972) that

the procedural policy of the State encourages [the sentencing judge] to consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and

any other matters that a judge ought to have before him in determining the sentence that should be imposed.[13]

See *Johnson v. State,* 274 Md. 536, 540, 336 A.2d 113 (1975); *Henry v. State,* 273 Md. at 147–148, 328 A.2d 293; *Purnell v. State,* 241 Md. 582, 585, 217 A.2d 298 (1965); *Farrell v. State,* 213 Md. 348, 355, 131 A.2d 863 (1956); *Driver v. State,* 201 Md. 25, 31, 92 A.2d 570 (1952); *Murphy v. State,* 184 Md. 70, 82, 40 A.2d 239 (1944). The short of it is that there is "a paucity of restraints being placed on a judge possessing the responsibility to impose punishment, lest he be 'forced to bridle himself with mental blinders and thus enter the process of imposing sentence with impaired vision.'" *Logan v. State,* 289 Md. 460, 482, 425 A.2d 632 (1981), quoting *Johnson,* 274 Md. at 542, 336 A.2d 113. To the multifarious information from multitudinous sources which the sentencing judge may consider, has been added, by express legislative dictate, evidence concerning the impact the crime had on the victim and his family.

In order to ascertain the true intention of the legislature we have gone behind the face of § 124 and perused its legislative history. We have sought out the data related thereto. We have traced the tortuous path of all the bills introduced from time to time which were concerned with victim impact evidence. We have followed each bill on its way to passage, or, more often, to rejection, noting such amendments and such reports, discussions and comments as were recorded. The General Assembly first evidenced concern with victim impact evidence in 1981. From 1981 through the first one and a half months of 1985, at least 19 bills on the matter had come before it. Three of the bills

---

13. The matters which may be considered by a sentencing judge may equally be considered by a jury called upon in a capital case to determine whether the defendant shall be executed or imprisoned for life. Md.Code, Art. 27, § 413(b) and (c)(v).

became law and four of them are pending in the present session.[14]

It appears that, pursuant to their broad discretion, sentencing judges had considered victim impact evidence even before the first legislation mandating victim impact statements. During consideration of the first measures that sought to require preparation of victim impact statements,[15] testimony disclosed that, in those counties with victim/witness assistance programs, victim impact statements were already being prepared, sometimes at the request of judges. A staff memorandum for the Senate Judicial Proceedings Committee concluded, however, that "each program varies greatly in its operation and the services that it offers, especially in sentencing input where there seems to be a case by case approach." [16]

At the hearing on S.B. 523 (1983), which would have required, in juvenile causes, consideration of testimony or a victim impact statement, a representative of the State's Attorneys' Association indicated that "under the present law there is no prohibition against victims testifying at the disposition. It is now within the court's discretion to permit a victim to describe the impact of the juvenile's act." In any event, "the impact of the child's act on the victim is already included in the intake reports for the more serious cases," according to the Juvenile Services Administration.

It is evident that the legislative intent in enacting victim impact statement legislation was to establish minimum standards for the information to be provided to judges and to make this information available in as many cases as fiscal constraints allowed. Thus, statements were required in all

---

14. The Governor has proposed S.B. 638 and H.B. 1502 which are now awaiting action in the General Assembly. These bills seek to enact a comprehensive scheme in the nature of a victim and witness bill of rights.

 Two other bills, S.B. 253 and H.B. 1472, provide express authorization for the victim or family to address the court.

15. S.B. 202 (1981) failed. S.B. 50 (1982) enacted Art. 41, § 124(c)(1) through (3) substantially as it appears now.

16. Senate Committee file on S.B. 50 (1982).

felony cases and in all misdemeanors "which resul[t] in serious physical injury or death." The legislature was, however, aware that some of the victim/witness assistance programs provided services in all cases before the circuit courts, and in some instances, all courts. The legislature also was aware that the Division of Parole and Probation intended to rely on these services, in order to fulfill its duties under the victim impact statement. Thus, it is clear that the legislature intended to extend, rather than restrict, existing practice.

This goal was most easily accomplished by imposing primary responsibility for completion of the statements in one State agency, since only 6 local jurisdictions had victim/witness assistance programs,[17] and those programs were subject to the vagaries of local politics.[18]

Lodowski notes, "[s]ignificantly, in its original version, Senate Bill 132 [1983] expressly provided that the statement might take the form of a statement in court by a family member. As enacted, however, that provision was stricken from the bill." S.B. 132 and the companion measure, H.B. 70, actually provided:

(1) In every case in which a victim impact statement is required by this section, the victim or a member of the victim's immediate family is entitled to address the sentencing judge [or jury] before the imposition of sentence, on written application to the sentencing [presiding] judge. The address may be in person or by affidavit.

(2) If a timely application is made, but sentencing is conducted without benefit of the address by the victim or member of the victim's immediate family for a reason attributable to the court, the sentence imposed shall be invalid.

---

**17.** These jurisdictions were Anne Arundel County, Baltimore City, Baltimore County, Howard County, Montgomery County, and Prince George's County.

**18.** A St. Mary's County program had been terminated on election of a new State's Attorney.

(3) If a sentence is invalid under the provisions of this subsection, a new sentencing hearing shall be conducted.[19]

Thus, S.B. 132 and H.B. 70 would have provided for testimony in addition to the victim impact statement and provided for a sentence to be invalidated absent this testimony.

Provisions invalidating the sentence clearly worried the legislators. A memorandum, evidently prepared by staff of the House Judiciary Committee, stated, "[t]he major practical problem of both bills 68 and 70 is the possibility of placing the defendant in jeopardy a second time during the sentencing rehearing." [20] The memorandum also addressed a concern about live testimony, which had been raised by an opponent of S.B. 132. However, staff posited that "[a]llowing the victim to address the factfinder would probably be constitutional, since the Supreme Court has approved sentencing procedures encompassing consideration of aggravating circumstances. The judge would have to exercise close supervision of this procedure, however, because the prejudice to the defendant in such a situation could easily overcome its relevance to the proceedings." The memorandum concluded that, "House Bill 70 would be acceptable, however, if [the] lines [invalidating the sentence] were deleted. The statute would have no teeth after such a deletion but it would provide the personal input toward which the statute is aimed." The Senate amended S.B. 132 to permit, *inter alia*, rather than mandate, this testimony and to strike the provisions invalidating the sentence. The House subsequently amended S.B. 132 to strike, *inter alia*, the provisions for live testimony and to substitute the language codified as Art. 41, § 124(d). The Senate refused,

---

19. The bracketed language indicates language in H.B. 70 that did not appear in S.B. 132.

20. H.B. 68 provided that if a required victim impact statement was not presented to the judge and the victim or a member of the immediate family made timely application, the sentence was invalid.

at first, to concur with the House amendments and, in fact, grafted the same provision onto H.B. 68. However, S.B. 132 had been returned on the last day of the session, and the Senate finally acceded to the House, evidently to avoid losing the measure entirely.

The failure of a bill to pass is "a weak reed upon which to lean" in determining legislative intent. *Police Comm'r v. Dowling*, 281 Md. 412, 420–421, 379 A.2d 1007 (1977), quoting *Harden v. Mass. Transit Adm.*, 277 Md. 399, 406, 354 A.2d 817 (1976). It is arguable, however, noting the concern over whether live testimony should be mandatory or permissive, that, in the final analysis, the legislature thought that live testimony was in any event admissible and that no legislation expressly providing for it was necessary. Support for this view is found in the fact, as we have seen, that the legislature was specifically aware that, in juvenile causes at least, live testimony was admitted. If the legislature had intended to abrogate this practice, it could have taken affirmative action to limit the broad discretion exercised by judges.

It is not a new and unusual concept that a sentencing judge may, in his discretion, entertain in open court evidence relevant to the imposition of sentence. This has long been established. Indeed, in the past, dispute over the receipt of such evidence did not focus on obtaining it in open court but rather on gathering it out of the courtroom from persons whom the defendant had not been permitted to confront or to cross-examine. The cases, however, which establish that the sentencing judge may consider information, even though it was obtained outside the courtroom without regard to the strict rules of evidence, indicate clearly that there was no impediment to obtaining it in open court through testimony. *See Williams v. New York*, 337 U.S. 241, 246–247, 69 S.Ct. 1079, 1082–1083, 93 L.Ed. 1337 (1949); *Logan v. State*, 289 Md. at 482, 425 A.2d 632; *Johnson v. State*, 274 Md. at 540–542, 336 A.2d 113; *Bartholomey v. State*, 267 Md. at 194, 297 A.2d 696; *Farrell v. State*, 213 Md. at 355, 131 A.2d 863; *Driver v. State*, 201

Md. at 32, 92 A.2d 570.[21] Thus, it is patent that over the years this Court has recognized and accepted without equivocation or question that a sentencing judge, in his discretion, may obtain information relevant to the imposition of sentence in open court through live testimony.

 We have observed that a sentencing judge is vested with broad discretion. We have noted the wide range of information which may be mustered by him as an aid to his determination of what sentence to impose. We have found that one long recognized method for the judge to obtain such information is through the testimony of witnesses in open court. We have taken cognizance of the legislative dictate that victim impact evidence is admissible in certain cases. We have traced the legislative history of the statute so providing. In the light of all this we are convinced that the victim and other persons, may, in the discretion of the judge presiding at the sentencing stage of the trial, testify in open court concerning the impact the offense had on the victim and members of his family.

### Remaining Questions

Since there may be a retrial on all counts in the indictment with a determination of guilt or innocence on evidence then admitted, we see no need to review the remaining questions presented by Lodowski.

### SUMMARY

I. *Our Holdings*

(1) In rejecting Lodowski's contention that the Grand Jury for Prince George's County was not selected by a method which was reasonably designed to produce a jury

---

**21.** We noted in *Bartholomey v. State*, 267 Md. 175, 193 n. 13, 297 A.2d 696 (1972), with supporting citations:

> Any information which might influence the judgment of the sentencing judge, not received from the defendant himself, or given in his presence, should (without necessarily disclosing its source) be called to the defendant's attention so as to afford him an opportunity to refute or discredit it.

representative of a cross section of the community, we hold that the indictment returned was valid.

Therefore, the court's denial of Lodowski's motion to dismiss the indictment was not erroneous.

(2) In rejecting Lodowski's contention that Art. 20 of the Declaration of Rights prevails over Art. IV, § 8 of the Maryland Constitution, and his contention that the removal provisions of Art. IV, § 8 deny equal protection of the law, we hold that the indictment was properly removed for trial to the Circuit Court for Charles County.

Therefore, the court did not err in overruling Lodowski's objection to the State's suggestion for removal.

(3)(a) In sustaining Lodowski's contention that the written third statement given by him was involuntary because he was denied his Fifth and Fourteenth amendment right to the assistance of counsel, we hold that the third statement was inadmissible.

The improper admission of the third statement so tainted the written first statement and the oral second statement as to make them inadmissible. The admission of the third statement was not harmless error.

Therefore, the court erred in denying Lodowski's motion to suppress the statements.

(b) The three statements were admitted in both the trial before a jury of the first, second and seventh counts and the trial before the court of the remaining six counts. Their presentation for the consideration of the trier of fact was prejudicial error with respect to each trial. It requires a reversal of all of the judgments entered and entitles Lodowski to a new trial.

(c) At retrial our holdings as to the validity of the indictment, its removal for trial and the admissibility of the third statement are the law of this case. They are conclusive and may not be relitigated.

II. *Our Views Expressed for the Guidance of the Trial Court*

(1) *The Guilt Stage of the Trial*

(a) The admissibility *vel non* of the testimony of Kenneth Ferber concerning the solicitation of him by Lodowski to participate in the commission of a crime requires factual findings by the trial judge in the light of the applicable law regarding the admissibility of such evidence.

(2) *The Punishment Stage of the Trial*

(a) With respect to aggravating circumstances, the judge was clearly erroneous in finding that Fletcher was killed while in the performance of his duties as a law enforcement officer.

(i) The opinion of the Chief of Police and others is not admissible to show that Fletcher was in the performance of his duties as a police officer when he was killed.

(ii) Evidence as to claims presented and awards and benefits paid in civil proceedings based on the fact that Fletcher was killed while in the performance of his duties as a law enforcement officer is not admissible in this criminal cause to show that fact as an aggravating circumstance to be considered in the imposition of punishment.[22]

(b) Victim impact evidence is

(i) not constitutionally proscribed;

(ii) relevant to a determination of the sentence to be imposed;

---

**22.** The view we express in this criminal cause that Fletcher was not in the performance of his duties as a law enforcement officer when he was killed has no relation to nor impact on the awards and benefits made to Fletcher's survivors as claimants in civil actions. We observe that, for one thing, the measure of proof is different in the two proceedings. Here the fact must be found beyond a reasonable doubt; in the civil action the fact may be established merely by a preponderance of the evidence. And, of course, there are entirely different fundamental policy considerations involved.

(iii) obtainable not only in writing by way of a pre-sentence investigation report, but also, at the discretion of the court, through live testimony in open court.[23]

## III. *Other Issues*

(1) We do not make a determination nor express a view as to the admissibility of the written first statement and the oral second statement given by Lodowski if they are offered absent their taint by reason of the receipt in evidence of the involuntary written third statement. (2) Since there may be a retrial on all counts in the indictment with a determination of guilt or innocence on evidence then admitted and rulings then made, we have no need to reach the remaining questions presented by Lodowski.

JUDGMENTS REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR A NEW TRIAL; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.[24]

ELDRIDGE, Judge, concurring.

I agree with the judgment and with all portions of the Court's opinion except the section dealing with victim impact evidence. The views expressed in that section are dicta. Furthermore, the matter may not arise again in this case after our reversal and remand. As both the majority opinion and Judge Cole's concurring opinion illustrate, the admissibility of the victim impact evidence in a case of this type presents constitutional issues. I would adhere to our normal policy of not ruling upon constitutional questions unnecessarily. *See, e.g., Rutherford v. Rutherford,* 296 Md. 347, 364 n. 6 (majority opinion), 366–367 (concurring opinion) 464 A.2d 228 (1983), and cases there cited. Conse-

---

**23.** Lodowski does not address the issue of the use of a written victim impact statement which is not on a form furnished by the Department of Parole and Probation and not submitted to the court through that agency. *See,* however, *Reid v. State,* 302 Md. 811, 490 A.2d 1289 (1985).

**24.** *See* Md.Rule 882 f.

quently, I would refrain from expressing any opinion concerning the admissibility of the victim impact evidence at the prior sentencing proceeding.

COLE, Judge, concurring.

I fully agree with the Court that appellant's conviction and sentence must be reversed and remanded for a new trial. I therefore join that portion of the Court's opinion. The Court, however, goes on to address in dicta the admissibility of victim impact evidence in capital sentencing proceedings. Because I cannot agree with the reasoning employed by the Court in its discussion of that issue, I write separately.

The Court makes two general observations in its discussion on victim impact evidence. First, the Court suggests there is no constitutional impediment to the legislature's determination that victim impact statements are relevant in a capital sentencing proceeding. Second, the Court intimates that the victim's family or other persons may, in the discretion of the presiding judge at the sentencing stage of the trial, testify in open court regarding the impact of the offense upon the victim and members of his family. The major problem with these twinfold conclusions is that they ignore the eighth amendment proscription against cruel and unusual punishment.[1] As the Court has not seen fit to examine this critical constitutional provision, I believe it essential to detail the premises, reasoning, and implications of the Court's unnecessarily broad dicta.

As a preface to my opinion, I wish to make three preliminary observations. First, I have no quarrel with the use of relevant victim impact evidence from the victim himself in non-capital sentencing proceedings. Victim impact evidence that details the relevant physical, emotional, and financial

---

1. The eighth amendment proscription against cruel and unusual punishment applies to the states through the fourteenth amendment due process clause. *See Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758, 763 (1962).

harm caused by the offender upon the victim often provides useful and valuable information that enhances the court's ability to fashion an appropriate sentence. This benefit, coupled with active victim participation, acts to restore and increase confidence in the criminal justice system. Second, the concerns I raise in this case are limited to the use of victim impact evidence in capital sentencing proceedings. This is not to suggest that I advocate the total abolition of victim impact evidence in capital sentencing proceedings; however, this evidence must be admitted with due regard to the Constitution. Third, I do not minimize the miserable ordeals these families have suffered as a result of these crimes. Nor am I insensitive to the considerable emotional problems faced generally by the families of murder victims. Nevertheless, as I see it, the Court's paramount duty is to preserve the integrity and fundamental fairness of the criminal justice system guaranteed to every citizen under our federal and state constitutions.

## I

The victim of lawlessness has often been the "forgotten person" in the criminal justice system,[2] and his neglect has been characterized as a "national disgrace." *President's Task Force on Victims of Crime* vii (Final Report Dec. 1982). In recent years, however, federal and state legislators have attempted to redress this situation by enacting laws designed to increase and enhance meaningful victim involvement in criminal proceedings. One method of victim involvement that has gained growing popularity is the use of victim impact statements in the sentencing process.[3]

---

**2.** *See* S.Rep. No. 532, 97th Cong., 2d Sess. 10, *reprinted in* 1982 U.S.Code Cong. & Admin.News 2515, 2516; Davis, Kunreuther & Connick, *Expanding the Victim's Role in the Criminal Court Dispositional Process: The Results of an Experiment,* 75 J.Crim.L. & Criminology 491, 492 (1984).

**3.** At least 31 jurisdictions authorize the use of a victim impact statement or similar form of victim input in the sentencing process. *See* Alaska Stat. § 12.55.022 (1984); Ariz.Rev.Stat.Ann. § 12–253.4 (Supp.

Broadly defined, a victim impact statement is an objective description of the medical, physical, financial, and emotional injuries inflicted by the offender upon the victim.

The Supreme Court has not determined whether the use of victim impact statements in capital sentencing proceedings violates the eighth and fourteenth amendments. Nevertheless, a careful review of the many death penalty cases decided by the Supreme Court in the last thirteen years convinces me that the unbridled use of victim impact evidence in capital sentencing proceedings is on a direct collision course with the constitutional ban against cruel and unusual punishment.

## II

As this Court recently observed, "[a]ny review of Supreme Court case law on capital punishment must begin with *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33

---

1984–1985); Ark.Stat.Ann. § 75–2502(c) (Supp.1983); Cal.Penal Code § 1203(h) (West Supp.1985); Conn.Gen.Stat.Ann. § 54–91c (West Supp. Pamphlet 1962 to 1983); Fla.Stat.Ann. § 911.143 (West Supp. 1985); Ind.Code Ann. § 35–38–1–9 (Burns 1985); Iowa Code Ann. § 901.3 (West Supp.1984–1985); Kan.Stat.Ann. § 21–4604(2) (Supp. 1984); La.Code Crim.Proc.Ann. art. 875.B (West 1984); Me.Rev.Stat. Ann. tit. 17–A, § 1257.2 (Supp.1984–1985); Md.Code (1957, 1984 Cum. Supp.), Art. 41, § 124; Mass.Ann.Laws ch. 279, § 4B (Michie/Law. Co-op.Supp.1985); Minn.Stat.Ann. § 609.115 1b(b) (West Supp.1985); Mont.Code Ann. § 46–18–112 (1984); Neb.Rev.Stat. § 29–2261 (Cum. Supp.1984); Nev.Rev.Stat. § 176.145 3 (1981); N.J.Stat.Ann. § 2C:44–6.b (West Supp.1984–1985); N.Y.Crim.Proc.Law § 390.30 (McKinney 1983); Ohio Rev.Code Ann. § 2947.051 (Page Supp.1984); Okla.Stat. Ann. tit. 22, § 982 (West Supp.1984–1985); Or.Rev.Stat. § 144.790(2), (4) (1983); R.I.Gen.Laws § 12–28–3(10) (Supp.1984); S.C.Code Ann. § 16–3–1550 (Law.Co-op.1985); Tenn.Code Ann. § 40–35–207(8) (1982); Vt.Stat.Ann. tit. 13, § 7006 (Supp.1984); Va.Code § 19.2–299.1 (Supp.1984); W.Va.Code §§ 61–11A–1 to –7 (1984); Wis.Stat.Ann. § 950.04(2m) (West Supp.1984–1985); Fed.R.Crim.P. 32(c)(2)(C). *See generally* Unif. Model Sentencing and Corrections Act § 3–204(9), 10 U.L.A. 78 (Special Pamphlet 1985) (recommending that presentence report include any statement relating to sentencing submitted by the victim of the offense or the investigative agency); *President's Task Force on Victims of Crime* 18, 33–34 (Final Report Dec.1982) (recommending that federal and state governments require victim impact statements at sentencing).

L.Ed.2d 346 (1972)." *Trimble v. State,* 300 Md. 387, 417, 478 A.2d 1143, 1158 (1984), *cert. denied,* 469 U.S. ——, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985). Each Justice in *Furman* authored an individual opinion either concurring in or dissenting from the judgment striking down the capital punishment statutes in Georgia and Texas. Five Justices supported the Court's per curiam opinion, while four Justices dissented. Three of these opinions are relevant to the discussion here.

Justice Douglas, concurring in the judgment, argued that the death penalty's arbitrary and discriminatory impact rendered it unconstitutional under the equal protection concept implicit in the eighth amendment proscription against cruel and unusual punishment. In particular, Justice Douglas condemned the sentencing procedures then in effect in Georgia and Texas because they vested the sentencing authority with "uncontrolled discretion" in deciding whether to impose capital punishment or imprisonment. *Furman v. Georgia, supra,* 408 U.S. at 253, 92 S.Ct. at 2734, 33 L.Ed.2d at 357 (Douglas, J. concurring).

Similar to Justice Douglas, Justices Stewart and White focused upon the administration of the death penalty. Justice Stewart found these statutes unconstitutional because the penalty was wantonly and freakishly imposed upon a capriciously selected few. *Id.* at 308–10, 92 S.Ct. at 2761–63, 33 L.Ed.2d at 389–90 (Stewart, J., concurring). According to Justice White, the infrequent imposition of the death penalty, together with no meaningful basis for distinguishing the few sentenced to die from the many spared the penalty, rendered the statutes unconstitutional. *Id.* at 313, 92 S.Ct. at 2764, 33 L.Ed.2d at 392 (White, J., concurring). The concurring opinions of Justices Stewart and White, therefore, made clear that the vesting of standardless sentencing power in the sentencing authority violated the prohibition on cruel and unusual punishment.

In the wake of *Furman* many states rewrote their capital punishment statutes in an effort to provide guided discre-

tion to the sentencing authority. Other states, however, read *Furman* as requiring a mandatory death penalty. These statutes reached the Supreme Court in 1976 and, in a series of plurality decisions, the Court upheld those statutes providing guided discretion to the sentencing authority, *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), but struck down those requiring a mandatory death penalty, *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

The *Gregg* plurality examined *Furman* and construed it as holding that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia, supra,* 428 U.S. at 188, 96 S.Ct. at 2932, 49 L.Ed.2d at 883 (Stewart, J., joined by Powell & Stevens, JJ.). In light of this interpretation, *"Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, *that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."* *Id.* at 189, 96 S.Ct. at 2932, 49 L.Ed.2d at 883 (emphasis supplied). This type of guidance is particularly appropriate when a jury acts as the sentencing authority because jurors generally lack experience in sentencing. In discussing the problem jurors have in dealing with the information they are given, the *Gregg* Court observed that this "problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Id.* at 192, 96 S.Ct. at 2934, 49 L.Ed.2d at 885.

An analysis of the death penalty statutes upheld by the Supreme Court in *Gregg, Proffitt,* and *Jurek* reveals that

the statutes incorporated three general methods of channelizing and guiding the discretion vested in the sentencing authority. First, the discretionary statutes created a bifurcated trial whereby the accused's guilt would be determined separately from his punishment. Second, the statutes authorized the death penalty in those cases involving certain aggravating circumstances, and directed the sentencing authority to consider the existence of mitigating circumstances. Third, the statutes were valid because they allowed expedited appellate review of the capital punishment sentence as a check against the random or arbitrary imposition of the death penalty. *See Tichnell v. State,* 287 Md. 695, 723–24, 415 A.2d 830, 845 (1980). These three general methods of guiding the sentencing authority's discretion therefore addressed the basic concern of *Furman* that defendants were being sentenced to death capriciously and arbitrarily.

In addition to discussing the guided discretion of the sentencer in capital sentencing proceedings, the plurality in *Proffitt* and *Jurek* emphasized the objective nature of the inquiry into the question of whether a defendant should be sentenced to death. *See Proffitt v. Florida, supra,* 428 U.S. at 259, 96 S.Ct. at 2970, 49 L.Ed.2d at 927 (Powell, J., joined by Stewart & Stevens, JJ.); *Jurek v. Texas, supra,* 428 U.S. at 273–74, 96 S.Ct. at 2957, 49 L.Ed.2d at 939 (Stevens, J., joined by Stewart & Powell, JJ.). As the plurality observed in *Jurek:*

> It thus appears that, as in Georgia and Florida, the Texas capital-sentencing procedure guides and focuses the jury's *objective* consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.

*Id.* (emphasis supplied).

In contrast to these guided discretion statutes, the Court found the mandatory death penalty statutes in *Woodson* and *Roberts* unconstitutional. The plurality in *Woodson* invalidated North Carolina's statute because it failed to satisfy *Furman*'s basic requirement by replacing arbitrary

and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the sentencing process in capital cases. *See Woodson v. North Carolina, supra,* 428 U.S. at 303, 96 S.Ct. at 2990–91, 49 L.Ed.2d at 960 (Stewart, J., joined by Powell & Stevens JJ.). The Court found a further shortcoming in that the statute did not permit the particularized consideration of relevant aspects of the character and record of each convicted defendant before imposing the death penalty. The *Woodson* Court further remarked:

> This Court has previously recognized that "[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55 [, 58 S.Ct. 59, 61, 82 L.Ed. 43, 46] (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York,* 337 U.S. [241, 247–49, 69 S.Ct. 1079, 1083–84, 93 L.Ed. 1337, 1342–43 (1949) ]; *Furman v. Georgia, [supra,* 408 U.S. at 402–03, 92 S.Ct. at 2810–11, 33 L.Ed.2d at 443–44] (Burger, C.J. dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Id.* at 304, 96 S.Ct. at 2991, 49 L.Ed.2d at 961 (citation omitted).

Subsequent decisions by the Supreme Court have confirmed that the thrust of its decisions on capital punishment

has been that the sentencing authority's discretion must be suitably directed and limited so as to immunize the risk of wholly arbitrary and capricious action. *See, e.g., Spaziano v. Florida,* 468 U.S. ——, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (death penalty decision must be based on the character of the defendant and the nature of the offense); *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (sentencer's discretion must be guided in a constitutionally adequate way); *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (need individualized determination on the basis of the defendant's character and the circumstances of the crime at the capital sentencing proceeding); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (vacating death sentence because it was imposed without the type of individualized consideration of mitigating factors as required by the eighth amendment); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 1769, 64 L.Ed.2d 398 (1980) (State must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (sentencing process must permit consideration of the character and record of the individual offender and the circumstances of the particular offense). To ensure that the sentencing authority's discretion is properly channeled and guided by clear, objective, and specific standards, courts of course retain their traditional authority to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense. *Id.* at 604 n. 12, 98 S.Ct. at 2965 n. 12, 57 L.Ed.2d at 990 n. 12. In view of these standards it is necessary to ascertain, in the context of capital sentencing proceedings, the constitutionality of victim impact evidence.

## III

Maryland's victim impact evidence statute was originally enacted in 1982, and has undergone various revisions since

that time. *See* Md.Code (1957, 1984 Cum.Supp.), Art. 41, § 124. This statute currently provides that various kinds of information be included in a victim impact statement. *See id.* § 124(c)(3). That information, it should be noted, deals with the impact of the crime upon the victim and, to a large extent, the victim's family. Section 124(c)(3) provides:

(3) A victim impact statement shall:

(i) Identify the victim of the offense;

(ii) Itemize any economic loss suffered by the victim as a result of the offense;

(iii) Identify any physical injury suffered by the victim as a result of the offense along with its seriousness and permanence;

(iv) Describe any change in the victim's personal welfare or familial relationships as a result of the offense;

(v) Identify any request for psychological services initiated by the victim or the victim's family as a result of the offense; and

(vi) Contain any other information related to the impact of the offense upon the victim or the victim's family that the court requires.

Victim impact statements, which are included in a presentence investigation report, were permitted in only the following situations prior to 1983:

1. The defendant, in committing a *felony,* caused physical, psychological, or economic injury to the victim; or

2. The defendant, in committing a *misdemeanor,* caused serious physical injury or *death* to the victim.

*Id.* § 124(c)(2)(i)(1)–(2) (emphasis supplied). Standing alone, these provisions do not by their terms authorize a victim impact statement in a capital sentencing proceeding because the word "death" is omitted from the felony category. *See id.* § 124(c)(2)(i)(1). Therefore prior to 1983, the only situation under § 124(c) in which a victim impact statement was admissible when a victim died as a result of a crime was where the defendant caused the victim's death while committing a misdemeanor, such as manslaughter by automobile. In

1983, however, the General Assembly enacted § 124(d), which expressly authorizes the use of victim impact statements in any case in which the State requests the death penalty. Section 124(d) provides in its entirety:

(d) In any case in which the death penalty is requested under Article 27, § 412, a presentence investigation, *including a victim impact statement,* shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 413 [Emphasis supplied; citations omitted.]

This statute, however, does not authorize the use of victim impact statements in every case where a defendant is convicted of murder, but only authorizes these statements when the State seeks the penalty of death in a first degree murder prosecution and obtains a conviction for that specific crime. This conclusion is reinforced by the provision in § 124(d) that allows this evidence to be used only in the "separate sentencing proceeding." Capital cases are the only cases requiring such separate proceedings. Moreover, because the death penalty may only be considered for first degree murder by a principal in the first degree, the statute necessarily precludes the general use of victim impact statements other than as specifically authorized. A cursory glance at the clear and unambiguous language of § 124(d) indicates that the legislature did not, for whatever reason, address any other circumstance involving a murder prosecution where a victim impact statement would be admissible, except when the State requests the death penalty. As a result of this peculiar statutory arrangement, a victim impact statement is not authorized in those situations where a felon causes the victim's death and that felon is not a principal in the first degree in a first degree murder case.[4]

---

**4.** The legislative history accompanying § 124(d) sheds no light on the rationale underlying this legislatively created void. The history of this legislation, however, reflects the studied haste in which § 124(d) was considered. Section 124 was inserted in a Senate bill in the waning

As I see it, the primary thrust of appellant's argument is that the use of victim impact evidence in this capital sentencing proceeding is constitutionally forbidden and amounts to an "arbitrary factor" in violation of Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 414(e)(1).[5] Evidently impatient with appellant's failure to refer to the precise constitutional provisions involved, the Court dismisses appellant's argument on the basis that "the legislature did not believe that victim impact evidence was an arbitrary factor." In my judgment, the Court in making this statement completely misses the point. The point is whether the admission and use of victim impact evidence in capital sentencing proceedings comports with the Constitution, not what the legislature may have perceived. The Court skirts the obvious eighth amendment issue in appellant's argument. Unlike

---

hours of the 1983 session of the General Assembly. *See* S. 132, 386th Sess. (1983) (enacted as amended at 1983 Md.Laws 297). Interestingly, this bill originally lacked a provision concerning the use of victim impact statements in capital sentencing proceedings. Instead, the bill was originally designed to permit the victim or his immediate family to address the court before sentencing. The Senate adopted the bill, and it was forwarded to the House of Delegates for approval. The House Judiciary Committee recommended that the provisions relating to victim allocution be struck in favor of an amendment that would authorize a victim impact statement in any case in which the death penalty is requested. The Senate acceded to these amendments and the bill was so enacted.

**5.** Whenever the death penalty is imposed, this Court is required to review the sentence on the record in accordance with the expedited review process set forth in Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 414(a)-(c). Therefore, this Court is charged with determining, *inter alia*, "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor[.]" *Id.* § 414(e)(1). If the imposition of the death sentence was influenced by an "arbitrary factor" under § 414(e)(1), the sentence must be set aside and the case remanded for a new sentencing proceeding under § 413. *See Tichnell v. State*, 287 Md. 695, 728, 415 A.2d 830, 847 (1980) (Tichnell I). The constitutional analysis I set forth is equally applicable, in my view, to the reasons § 414(e)(1) has been violated.

the Court, however, I address that issue and conclude that the victim impact evidence in this case is unconstitutional.[6]

### A.

At the sentencing proceeding the trial court allowed into evidence the victim impact statements by Officer Fletcher's widow and Minh Phamdo's mother. Putting aside for one moment the issue of whether the statement by Minh's mother had the slightest relevance in this case, portions of the statement by Fletcher's widow should have never been allowed into evidence on the basis that they constituted an arbitrary factor in violation of the eighth and fourteenth amendments.

Time and again the Supreme Court has emphasized that the sentencer's discretion in a capital sentencing proceeding must be channeled and guided by clear, specific, and objec-

---

**6.** Although it is unnecessary in this proceeding to determine the facial constitutionality of the victim impact evidence statute, I nonetheless have serious doubts that substantial portions of § 124(c)(3) would satisfy the Constitution. At a constitutional minimum, evidence introduced at a capital sentencing proceeding must be relevant as to whether the accused's life be taken or spared. The information must be relevant, of course, to avoid the arbitrary and capricious infliction of the death penalty. In light of this standard, several portions of § 124(c)(3) pass muster. For instance, the identity of the victim (e.g., police officer) is often relevant, *see* § 124(c)(3)(i), as is other information that goes to the character of the defendant and the circumstances of the offense, *see* § 124(c)(3)(vi).

Other information called for by § 124(c), however, would rarely, if ever, be relevant in a capital sentencing proceeding. In particular, psychological services requested by the victim's family as a result of the offense are irrelevant. *See* § 124(c)(3)(v). In addition, it is difficult to see the relevance of whether the victim suffered any economic loss as a result of the offense, unless of course the victim was murdered during the course of a robbery or similarly economically-motivated crime. *See* § 124(c)(3)(ii). Section 124(c)(3)(iii), which deals with the identification of any physical injury suffered by the victim as a result of the crime along with its seriousness and permanence, seems superfluous in a capital case for obvious reasons. Lastly, any changes in the victim's familial relationships as a result of the offense are irrelevant to the sentencing decision. *See* § 124(c)(3)(iv). Otherwise, a factor in imposing the death penalty would always be whether the victim died leaving a family. Few factors could be as irrelevant and arbitrary as those called for in § 124(c)(3)(ii), 124(c)(3)(iii), 124(c)(3)(iv), and 124(c)(3)(v).

tive standards. *See, e.g., Barclay v. Florida, supra,* 463 U.S. at ——, 103 S.Ct. at 3424, 77 L.Ed.2d at 1144; *Godfrey v. Georgia, supra,* 446 U.S. at 428, 100 S.Ct. at 1764–65, 64 L.Ed.2d at 406; *Woodson v. North Carolina, supra,* 428 U.S. at 303, 96 S.Ct. at 2990–91, 49 L.Ed.2d at 960. Evidence that has the effect of arousing the passion and prejudice of the sentencer does not satisfy this constitutional standard. Similarly, evidence irrelevant to the sentencing decision has no place in a capital sentencing proceeding. A review of the statements introduced in this case makes these points indelibly clear.

Fletcher's widow submitted a victim impact statement that detailed the emotional injury sustained by her and her young daughter, Carlita. The use of this statement, in light of its content, had no purpose other than to arouse and incite the passions of the sentencing authority:

I still cannot understand how a human being could walk up to another person and brutally shoot him with a shotgun, without giving it a second thought. I still have nightmares about how Carlton must have looked and felt when he saw a shotgun pointed at him. Then I think about the way he was shot in the neck and then in the shoulder, without a chance to defend himself—I can only hope that he did not feel much pain!

I remember when I went to the funeral home to see his body for the first time after the crime. It was then that the reality of his death hit me fully and it was hard to realize that it was all over, and I didn't even get a chance to be with him in the end. I can still see my father holding Carlita up to see her daddy and see how confused and upset she was, and hearing her asking my father "why does my daddy have that long scar on his neck". It really scares me to think that there are people walking the street who are capable of taking another person's life and feeling no remorse. Since this crime I am scared to trust anyone.

However deserving this is of sympathy, it remains that it does not channel and guide the sentencer's discretion in a

constitutionally permissible manner. By appealing to the passions and prejudices of the sentencing authority, the above quoted passages represent an "arbitrary factor" in the decisional process. In my view, it is arbitrary to base a decision as to whether an accused should live or die on the basis of subjective impressions a widow has of the crime and the funeral. Predicating the death penalty decision on this type of evidence propels us full force to the pre-*Furman* era of the arbitrary imposition of capital punishment. Further passages from Mrs. Fletcher's statement highlight this conclusion:

> I have been in a state of shock and devastation since this crime has occurred. It has drastically changed my whole future and the future of my children.
>
> Carlton and I were both religious and felt that children needed both mother and father to have a well-rounded upbringing. We were both looking forward to the birth of our second child. At the time of the crime, I was six months pregnant. I still cannot imagine raising two children without a father and know that Carlton won't even have a chance to see his second child. It hurts when I see other children with their fathers, knowing that my children don't have a father now who can love and hold them.
>
> Carlton was the perfect family person, he was totally devoted to his family. It was like a miracle to find a man like him—we had something very special. We had created a love that could withstand anything in life. We were not only husband and wife, but best of friends. We had respect and trust for each other, which is hard to find in couples today.
>
> Ever since this happened, I feel alone and empty inside, a feeling that no one can ever take away. I still think about the last day we had together, he had taken us to the "Enchanted For[e]st". I can't help but think of all the plans we had for the future, all of which were so abruptly changed. I have known Carlton since I was fourteen years old, he was my first and only boyfriend. I

am now 28 years old and I feel like half of my life has been taken away. When he died part of me died too. The punishment of death, unique in its severity and irrevocability, *see Gregg v. Georgia, supra,* 428 U.S. at 187, 96 S.Ct. at 2931, 49 L.Ed.2d at 882, should not turn upon these considerations.

Section 124(c)(3)(v) provides that the victim impact statement "[i]dentify any request for psychological services initiated by the victim or the victim's family as a result of the offense[.]" The victim impact statement submitted by Fletcher's widow contains a lengthy account of the psychological impact of the crime upon Carlita, Fletcher's minor daughter. The gripping account makes it easy to overlook the fact that it has no legitimate role in a capital sentencing proceeding. The text of this statement, reprinted at length below, demonstrates that it is an arbitrary factor in the sentencing decision:

> My 3-year-old daughter Carlita has suffered both emotional and psychological stress as a result of this crime and I have had to take her to a child psychiatrist. Carlita and Carlton were extremely close since the time of her birth. Whenever he was home, he would spend his time with Carlita, taking care of her, helping her and teaching her the right things in life.
>
> Since his death, Carlita has been extremely confused. She asks me "why doesn't my daddy come back", "who is going to be my daddy now that my daddy is gone". Even some mornings when I take her to school, she will say to me when she sees her father's car sitting in the yard "I want my daddy to come back and drive his car". What can I say to my 3-year-old child asking these questions, when in my heart I want the same thing! At night Carlita has nightmares, waking up screaming and crying for her daddy. When I took her to the child psychiatrist, the doctor told me that Carlita's and Carlton's relationship was more like a mother-daughter relationship, because of their closeness. So Carlita's loss was ever greater because of this relationship. Since she lost her

father, she is afraid to let me out of her sight, and has expressed the fear that she will lose me too.

I am also very upset about the effects this crime might have on my unborn child. Because of the stress I felt, my blood pressure was elevated considerably, I have had a loss of appetite and have difficulty finding any sleep at night. My physician was very concerned about my condition, fearing that the baby might be born prematurely. Every time Carlita and I see a police office[r] or a police car, it is a constant reminder of Carlton and how he died.

In sum, I find little information in the victim impact statement submitted by Fletcher's widow that is relevant, from a constitutional standpoint, and that does not constitute an arbitrary factor. Simply stated, and without intending to minimize the suffering of the victim's family, it is irrelevant to the death penalty decision that the daughter of a murder victim undergoes psychiatric treatment for the emotional injury caused by the offense. If that were the case, factors in the capital sentencing proceeding would be whether the victim left any minor survivors and the susceptibility of emotional trauma of a particular family member to the murder. Surely, neither the eighth amendment nor the decisions of the Supreme Court would sanction factors such as these in a death penalty case.

The Court inexplicably avoids the issue of whether the evidence of the impact Minh's murder had on his family is relevant to a determination of the sentence to be imposed on appellant upon his conviction of murdering Fletcher. Given the Court's conceded urgency to provide guidance to the lower court on retrial, it is bewildering why it does not reach this particular issue. Because there is no indication that the State will not again use the victim impact statement of Minh's mother at appellant's retrial, the Court is mistaken in hoping that its broad-ranging dicta will "[avoid] the burden of appeals" it so earnestly seeks to avoid.

At the outset, I note that § 124 by its terms bars the victim impact statement submitted by Minh's mother in

Lodowski's capital sentencing proceeding. Lodowski was convicted as a principal in the first degree in the first degree murder of Officer Fletcher, and as a principal in the second degree in the first degree murder of Minh. In a separate trial, Lodowski's confederate, Kamel Elfadl, was convicted as a principal in the first degree in the first degree murder of Minh.[7] Without repeating in detail why the only class of felonies for which a victim impact statement is authorized under § 124 when the felon causes the victim's death is limited to first degree murders committed by principals in the first degree, it is obvious that § 124 may authorize the victim impact statement submitted by Mrs. Fletcher. Because § 124 does not in any sense authorize the use of victim impact statements in cases involving a first degree murder committed by a principal in the second degree, the victim impact statement submitted by Minh's mother in Lodowski's capital sentencing proceeding is inadmissible. Manifestly, had Lodowski been tried in a separate trial for the murder of Minh, the victim impact statement submitted by Minh's mother would not be allowed into evidence under § 124. That Lodowski was tried for the murders of both Fletcher and Minh in a single proceeding does not alter this reasoning one whit.

Assuming *arguendo* that this statement is admissible in Lodowski's capital sentencing proceeding, I am satisfied that portions of this statement constitute an arbitrary factor under Art. 27, § 414(e)(1) and violate the eighth and fourteenth amendments.

Several passages in the victim impact statement submitted by Minh's mother injected passion and prejudice into the sentencing process. For instance, in describing the impact of the crime upon her husband (Tue Phamdo), Minh's mother wrote:

Tue used to rely on Minh as a second dad for the family. Minh was his assistant. Tue can't eat nor can he sleep at

---

7. Elfadl's conviction was later reversed by the Court of Special Appeals. *See Elfadl v. State,* 61 Md.App. 132, 485 A.2d 275 (1985).

night. He's so stunted with shock that he can't even cry and let his emotions out. *He often has chest pains as if a bullet pierces through his right lung—where Minh was hit at close range with a shot gun.* I'm very worried about my husband's health. I'm worried about my younger sons' future. [Emphasis supplied.]

In a section entitled "Our Past Happy Days," [8] Minh's mother stated that before her son's murder the family would share the day's events at dinner. After Minh's death, however, this practice ceased:

> We were very happy for we believed that we could finally settle in a peaceful country, away from violence and persecution. Our children's [sic] eyes shone with love for this new country (Minh died two weeks after he obtained his U.S. citizenship). Now that Minh is gone none of us talked at the dinner table. We lost our family sharing time, we lost our happiness.
>
> * * * * * *
>
> We relied on Minh on everything. We put all of our hope in Minh. Minh in turn proved himself to be a worthy son. He contributed a lot to the well-being and the happiness of our family. Without Minh we have lost the family unit, we lost our sharing time such as household chores or mowing the grass and weeding the garden. We are a close knit family. Without Minh our family is not complete.

The victim impact statement goes on to describe, in simple but descriptive terms, the effect of the crime upon the family members. Again, however, this evidence has no

---

8. Although the Court does not indicate whether a victim impact statement must be on a form furnished by the Division of Parole and Probation, it is important to realize that a statement styled and captioned at the whim of the victim or the victim's family adds more prejudice and arbitrariness in the sentencing process. Here, the statement submitted by Minh's mother contained topic headings such as "Our Past Happy Days" and "How Does This Crime Affect Us." Moreover, the statement included a photograph of Minh and his family.

legitimate role in a capital sentencing proceeding. The impact a violent crime has on a particular familial relationship is not relevant to the imposition of the death penalty. The reason, it seems to me, is obvious. To allow evidence of this genre into a capital sentencing proceeding injects factors that have nothing to do with the defendant's level of culpability in the offense for which he is being sentenced. As one court recently put it, "the fact that a victim's family is irredeemably bereaved can be attributable to no act of will of the defendant other than his commission of homicide in the first place. Such bereavement ... has no relationship to the proper purposes of sentencing in a criminal case." *People v. Levitt*, 156 Cal.App.3d 500, 517, 203 Cal.Rptr. 276, 288 (1984).

The statement also contains other information that should have been excluded by the sentencing court. This information deals with the emotional troubles experienced by various members of Minh's family.

> We have been suffering incessantly because of this crime. Minh's grandmother (on his dad's side) is 74 years old and is living with us. She wept and fainted very often. She beli[e]ves that when she passed away her soul would wander aimlessly for her first grandson is not on earth to worship her. Any other grandson who would take over the duty of ancestor wor[s]hipping would not be as effective as Minh, the first born. At the dinner table, each time she saw a dish which was Minh's favorite, it reminded her of his so she broke out crying and had migraine headaches and lost her voice. All of us couldn't eat. We all lost weight and became pale.

> Ho Tan, Minh's six years [sic] old brother, started to wet his bed and woke up in the middle of the night crying. He was shivering with fears; he held me tightly and asked "Why are bad guys stronger than the police, mommy?"

> Tuan and Nam [Minh's younger brothers] have become withdrawn. They isolate themselves. They quit ta[l]king and playing as they normally do. They sit and stare at

books for hours without registering anything. They have stopped telling us about themselves, they have stopped asking each other questions about Math, History and Science. Nam and Tuan each now sits [sic] at a corner of the house, motionless.

Finally, Minh's mother wrote of the impact the murder had upon her:

As Minh's mother I suffer the most. I did not only lose a son but I've also lost a friend who was my right arm. I've developed severe headaches. I feel exhausted all the time. I can't control my tears even in public places. I can't concentrate and can't type anymore. My whole body often shakes with fear and I drop things constantly. I'm so frightened. I dread that some evil men are there to wait for me and for my other sons. Noises are amplified in my head and send pain to my heart. How can I protect my other sons? What can I do? I'm so frightened. I'm so confused. I had never missed a day of work during my first four years with the Red Cross but I had to call in sick five times [in] the last two months. I've had constant anxiety attacks that make it hard for me to get out of bed in the morning. I'm so confused on how to teach my children. I've lost faith in people. I had taught Minh to be industrious and compassionate yet we encountered disaster. Each passing day is a big struggle for us. We are lost; having lost our most loved son we have lost our goal in life. We don't communicate with each other in the family anymore. Each one of us suffers silently and alone. We feel drained out. They have not just killed one person, Minh, but they have successfully killed a family of six, whose mere wish is to live simply and peacefully.

Nowhere does the Court make an effort to analyze these statements. This omission is to some extent understandable, of course, because it permits the Court to avoid the imposing task of squaring these statements with the Constitution. Despite this omission, the Court's reasoning suffers from yet other fundamental infirmities.

## B.

In a 1974 case, this Court stated that "the sentence should be fashioned, to the best of the sentencing judge's ability, *to the facts and circumstances surrounding the crime and the individual then being sentenced."* *Henry v. State,* 273 Md. 131, 150, 328 A.2d 293, 304 (1974) (emphasis supplied). Based upon this statement, appellant argues that victim impact evidence does not relate to either of those matters and, as a result, is inadmissible. The Court rejects this argument because "there is a reasonable nexus between the impact of the offense upon the victim or the victim's family and the facts and circumstances surrounding the crime especially as to the gravity or aggravating quality of the offense." The Court's reasoning is unconvincing. In my view, the Court tortures its earlier decisions and, more important, ignores controlling Supreme Court precedents.

The Court fails to acknowledge that *Henry* is a non-capital case. Given this less than subtle distinction, it is difficult to understand how the Court can so easily apply non-capital sentencing guidelines to capital sentencing proceedings. The more appropriate analytical approach is found in a host of Supreme Court decisions dealing with the death penalty. *See, e.g., California v. Ramos, supra,* 463 U.S. at ——, 103 S.Ct. at 3452, 77 L.Ed.2d at 1180–81; *Zant v. Stephens, supra,* 462 U.S. at ——, 103 S.Ct. at 2743–44, 77 L.Ed.2d at 251; *Lockett v. Ohio, supra,* 438 U.S. at 604–05, 98 S.Ct. at 2964–65, 57 L.Ed.2d at 990; *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 636, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637, 641 (1977) (per curiam); *Woodson v. North Carolina, supra,* 428 U.S. at 302–03, 96 S.Ct. at 2990, 49 L.Ed.2d at 960. Under this approach, "the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the *character and record of the individual offender and the circumstances of the particular offense* as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* at 304, 96 S.Ct. at 2991, 49 L.Ed.2d at 961 (emphasis

supplied; citation omitted). Information contained in a victim impact statement that strays beyond these limits violates the eighth and fourteenth amendments.

On the facts of this case, it is clear to me that the victim impact statements are not limited to "the character and record of the individual offender and the circumstances of the particular offense." Manifestly, the survivors of the murder victims cannot relate any relevant facts concerning the circumstances of the murders because the survivors were not present at the time of the crime. Furthermore, the record does not indicate that any members of the victims' families were personally acquainted with the appellant and his confederate prior to the commission of this crime. *See People v. Ramirez*, 98 Ill.2d 439, 454, 75 Ill.Dec. 241, 248, 457 N.E.2d 31, 38 (1983). To construe "circumstances of a particular offense" to encompass the type of information contained in these victim impact statements is to stretch that phrase to the breaking point. Rather, the Supreme Court has limited this phrase to the specific circumstances of the crime, such as whether it was committed in the course of a capital felony or whether it was committed upon a peace officer or judicial officer. *See Gregg v. Georgia, supra,* 428 U.S. at 197, 96 S.Ct. at 2936, 49 L.Ed.2d at 888 (Stewart, J., joined by Powell & Stevens, JJ.). Consequently, the court erred in admitting into evidence those portions of the victim impact statements that were not limited to these matters.

The Supreme Court's decisions in *Gregg v. Georgia, supra,* and *Jurek v. Texas, supra,* do not lend support to the Court's reasoning. In *Gregg,* the appellant objected to the wide scope of evidence and argument allowed at presentence hearings. In rejecting this argument, Justice Stewart observed that "[s]o long as the evidence introduced and the arguments made at the presentence hearing *do not prejudice a defendant,* it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia, supra,* 428 U.S. at 203–04, 96

S.Ct. at 2939, 49 L.Ed.2d at 891–92 (emphasis supplied); *see Jurek v. Texas, supra,* 428 U.S. at 276, 96 S.Ct. at 2958, 49 L.Ed.2d at 941 ("essential . . . that the [sentencing authority in a death case] have before it all possible *relevant* information about the individual defendant whose fate it must determine.") (emphasis supplied); *Johnson v. State,* 292 Md. 405, 442–43, 439 A.2d 542, 563 (1982) (quoting *Jurek* and Art. 27, § 413(c)(v)). The statements here do not satisfy these relevance and non-prejudicial requirements.

The Court relies upon a 1977 decision by the Supreme Court of Alaska in support of its position that "the impact of the crime on the victim is a relevant circumstance surrounding the commission of the offense and thus can properly be included in the presentence report." *Sandvik v. State,* 564 P.2d 20, 23 (Alaska 1977) (footnote omitted). I fail to see the relevance of this case insofar as Alaska has never had a capital punishment statute since its admission into the Union in 1959.

It also bears mentioning that the trial court erred in admitting that portion of the victim impact statement submitted by Minh's mother that recommended the court to "justify Minh's death with a harsh sentence[.]" Section 413(c)(iv) of Article 27 states in clear language that "any recommendation as to sentence contained in the [presentence investigation report (which in turn contains the victim impact statement)] is not admissible" in a capital sentencing proceeding. The introduction of this kind of material in blatant disregard of the death penalty statute underscores my contention that the sentencing court should meticulously examine victim impact statements. Material that is irrelevant to the capital sentencing decision should be redacted from the statement. Given the guidance by the Supreme Court, this should not be an imposing task.

Finally, other jurisdictions have statutorily recognized, specifically or inferentially, that victim impact evidence has no legitimate purpose in a capital sentencing proceeding. *See, e.g.,* Conn.Gen.Stat.Ann. § 54–91a (West Supp.Pamph-

let 1962 to 1983) (presentence investigation not required in capital cases); Okla.Stat.Ann. tit. 22, § 982 (West Supp. 1984–1985) (in all felonies *except when the death sentence is imposed,* the court shall order a presentence investigation to include the voluntary statement of the victim concerning the offense); S.C.Code Ann. § 16–3–1550 (Law.Co-op.1985) (authorizing victim impact statement for all crimes except for any crime for which the death penalty is sought).[9]

## IV

The Court suggests that a person other than the victim may, in the discretion of the presiding judge at the sentencing stage of the trial, testify in open court regarding the impact of the offense upon the victim and members of his family. I vehemently disagree.

## A.

By disregarding well-settled rules of statutory construction, the Court fashions the above proposition out of whole cloth. This Court has stated on innumerable occasions that absent ambiguity or obscurity in the statutory language, there is usually no need to look elsewhere to ascertain the intent of the General Assembly. *See, e.g., State v. Oliver,* 302 Md. 592, 599, 490 A.2d 242, 245 (1985); *Sibert v. State,* 301 Md. 141, 153, 482 A.2d 483, 489 (1984); *Board of Examiners in Optometry v. Spitz,* 300 Md. 466, 474, 479 A.2d 363, 367 (1984); *City of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984); *Ryder Truck Lines, Inc. v. Kennedy,* 296 Md. 528, 535, 463 A.2d 850, 855

---

**9.** Massachusetts law provides that a victim may submit a written victim impact statement in all felony cases, excluding capital cases. *See* Mass.Ann.Laws ch. 279, § 4B (Michie/Law.Co-op.Supp.1985). Late last year, however, the Supreme Judicial Court of Massachusetts struck down that jurisdiction's death penalty statute on the basis that it impermissibly burdened the state constitutional rights against self-incrimination and the right to a jury trial. *Commonwealth v. Colon-Cruz,* 393 Mass. 150, 470 N.E.2d 116 (1984).

(1983); *Vallario v. State Roads Comm'n,* 290 Md. 2, 6, 426 A.2d 1384, 1385–86 (1981); *Harden v. Mass Transit Admin.,* 277 Md. 399, 406, 354 A.2d 817, 821 (1976). In applying this rule to the case *sub judice,* it is evident that the Court strains mightily to reach the relevant legislative history.

As an initial matter, the Court concedes, as it must, that § 124 of Art. 41 does not specifically authorize live testimony. The Court further concedes that the presentence reports provided for in that section are "[u]nquestionably" to be written. In light of these concessions and the unambiguous and clear language of § 124, I cannot understand why the Court rushes headfirst to analyze the legislative history of that section. Before today, I had thought it settled that the Court is precluded from resorting to extrinsic aids to analyze the legislative intent of a particular statute when that statute is unambiguous and clear. Indeed, "[g]oing behind the plain language of a statute in search of a possibly contrary [legislative] intent is 'a step to be taken cautiously' even under the best circumstances." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748, 759 (1982) (quoting *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124, 143 (1977)). By sweeping aside that nettlesome rule, the Court allows itself to engage in a lengthy and unnecessary review of the legislative history of § 124. Because the path the Court takes is misguided and the inferences it draws are questionable, I cannot ignore the Court's gratuitous discussion.

The General Assembly has rejected, on at least eight occasions, bills that would have authorized victim allocution at sentencing. *See* S. 253, 388th Sess., § 1 (1985); H.B. 1472, 388th Sess., § 1 (1985); S. 793, 387th Sess. (1984); H.B. 1512, 387th Sess. (1984); S. 523, 386th Sess. (1983); H.B. 70, 386th Sess. (1983); H.B. 68, 386th Sess. (1983); *see also* S. 132, 386th Sess. (1983) (provision authorizing victim allocution deleted from bill prior to its passage and enactment). In the face of these rejections, the Court speculates

that "the legislature thought that live testimony was in any event admissible and that no legislation expressly providing for it was necessary." A contrary conclusion, however, is equally plausible. For a legislature to introduce nearly ten bills over a three year period on the same topic for which no legislation is presumably necessary is contrary to common sense. Indeed, a considerable number of legislators have seen fit to introduce these bills. For instance, in the 1985 session of the General Assembly, fifty-eight delegates sponsored the victim allocution bill (H.B. 1472), while ten senators sponsored the corresponding Senate bill (S. 253). Both failed.

Additional reasons support my view that § 124 does not authorize live victim testimony. First, states that have authorized victim allocution have specifically done so in their statutes. The leading treatise in the area of statutory construction states that "[s]imilar statutes of other states comprise a type of extrinsic aid deserving special attention in the process of interpretation." N. Singer, 2A *Statutes and Statutory Construction* § 52.01, at 521 (Sands 4th ed. 1984). A cursory glance at Maryland's victim impact evidence statute discloses that it is similar to that of many other states. Unlike other states, however, Maryland has not added a specific provision authorizing victim allocution. The reasonable conclusion to be drawn, therefore, is that the legislature did not intend for live victim testimony to be admitted.

Second, the Court gathers from the testimony of a representative of the State's Attorney's Association at a hearing on one of the victim impact bills that live testimony is admissible in juvenile causes. Based on this testimony the Court reasons that the General Assembly's failure to enact legislation to abrogate this practice evidences its reluctance to limit the discretion exercised by judges. I am appalled that the Court can so blithely equate juvenile causes with capital sentencing proceedings. Juvenile causes, as the Court surely is aware, are not subject to the carefully delineated constitutional constraints applicable in capital

sentencing proceedings. Moreover, the Court does not point to any Maryland appellate decision or rule of court sanctioning the use of this form of testimony in juvenile causes. The Court's reasoning, not appellant's, is suspect.

Third, after reviewing a line of cases, the Court concludes that "it is patent that over the years this Court has recognized and accepted without equivocation or question that a sentencing judge, in his discretion, may obtain information relevant to the imposition of sentence in open court through live testimony." *See Williams v. New York, supra; Logan v. State,* 289 Md. 460, 425 A.2d 632 (1981) (4–3 decision); *Johnson v. State,* 274 Md. 536, 336 A.2d 113 (1975); *Bartholomey v. State,* 267 Md. 175, 297 A.2d 696 (1972) (5–2 decision); *Farrell v. State,* 213 Md. 348, 131 A.2d 863 (1957); *Driver v. State,* 201 Md. 25, 92 A.2d 570 (1952). Two of these cases are irrelevant in the case *sub judice* because they involved a non-capital offense. *See Logan v. State, supra* (second degree murder); *Johnson v. State, supra* (burglary). The remaining cases, for the reasons assigned below, likewise lend no support to the Court's view.

The Court relies upon *Bartholomey v. State, supra,* for the "broad discretion of a sentencing judge." The Court does not tell us, however, that the *Bartholomey* Court made this statement in the context of a rape case. *Bartholomey v. State, supra,* 267 Md. at 193, 297 A.2d at 706. Indeed, the Court limited its discussion to the discretion of the sentencer under the rape statute, Art. 27, § 461. Furthermore, given the fact that *Bartholomey* and the other capital cases cited by the Court pre-date the Supreme Court's post-*Furman* decisions, I cannot fathom why the Court views these cases as relevant. Post-*Furman* cases emphasize that the sentencer's discretion in a capital sentencing proceeding must be guided and channeled by clear, specific, and objective standards. *See, e.g., Barclay v. Florida, supra,* 463 U.S. at ——, 103 S.Ct. at 3424, 77 L.Ed.2d at 1144; *Godfrey v. Georgia, supra,* 446 U.S. at 428, 100 S.Ct. at 1764–65, 64 L.Ed.2d at 406; *Woodson v.*

*North Carolina, supra,* 428 U.S. at 303, 96 S.Ct. at 2990–91, 49 L.Ed.2d at 960.

### B.

Even if I were to agree that live victim testimony is authorized in capital sentencing proceedings (which I do not), a review of the testimony in this case indicates that it suffers from the same constitutional infirmities as the victim impact statements. In my view, none of the testimony of Minh's mother or Fletcher's widow is relevant as to whether the sentencer should impose the death penalty. Rather, this testimony constituted an arbitrary factor because it saturated the sentencing process with passion and prejudice. A review of the live testimony makes this conclusion obvious.

At appellant's sentencing proceeding, Fletcher's widow explained the relationship that existed between Fletcher and his young daughter:

> Well, when she was born, I had a high temperature, so [my husband] was there at the hospital every day feeding her, and then after I came home, he took off to be with her, too. When I took her to the psychiatrist, they were so close, the psychiatrist said his death was more like the death of the mother, instead of the father, because that was the type of relationship that they had.

> She still wonders what has happened to him. She asks me now, can she get in the airplane and go see her father. She doesn't understand why he can't come back. When we moved, the psychiatrist said she thinks her father is going to come to the new house. Even though she knows he's dead, she still hopes one day he will be back. She still has nightmares about his not being there, and she has problems with guns, because she knows he was shot with a gun.

Mrs. Fletcher then went on to explain what prompted her to seek psychiatric treatment for her daughter:

Well, she started waking up at nights screaming and crying, saying she's talking to her daddy, and then she started having problems with guns. She'd take the nozzle off the hose and point it at people, saying she was going to shoot them, and that's why we started taking her to the psychiatrist.

The prosecutor then elicited testimony from Mrs. Fletcher, who was then pregnant, concerning the physical impact of the crime upon her:

The stress has prolonged the baby's growth. I had two sonograms. The first one the doctor said the baby was too small to be born the normal time. He said he can't really tell whether it was the mix-up with dates or the stress, but he said both of them have probably played a part in it, because I shouldn't be going this long.

This testimony, highly deserving of sympathy as it is, has no relevance in *any* capital sentencing proceeding. The emotional problems experienced by a three-year-old girl as the result of her father's violent death and the physical problems encountered by the victim's widow in the late stages of her pregnancy are arbitrary factors upon which to impose the death penalty. Testimony such as this does not guide and channel the sentencer's discretion; instead, it unleashes the sentencer's discretion on matters not bearing upon the defendant or the circumstances of the offense. The passion and prejudice that results from this type of testimony does not require explanation.

Equally unconstitutional is the testimony from Mrs. Fletcher regarding the overall impact of the murder upon her and her family. Through this cathartic testimony Mrs. Fletcher recommended that appellant be sentenced to death:

[A]fter going through the trial and hearing the different testimonies, it's still kind of hard for me to get over the way he died. I heard—one of the witnesses said she went up to the car, and she saw his head off, and I guess that I still lay awake at night thinking about how could somebody be so heartless as to shoot somebody, and then go back and shoot him again after they shot his head off.

Then I think about all this happening, going through this, and I figured, after you do something like that, you get 15 to 20 years, and you're back out on the street; you know, what kind of system is it? You can kill somebody and then you walk the streets again? *I guess, personally, I feel, if you kill anyone, you should be put to death,* because that doesn't give you the right to go out and kill somebody and then walk the streets again.

Then, I went to another policeman's, who was shot, wake, and one of the sons of an officer who was killed back in '68 or '69, his son was there, and he was telling me that he was 11 years old when his father died, and I was asking him how did he deal with it. He says, "Well, you really don't never deal with it." He says, "I still think about when they came to the door and rung the doorbell that time of night. I knew my father, something had happened to him, because nobody comes to your house that early in the morning." He says, "I go to all these ceremonies for the dead policemen," and he said, "The only thing that really helped me was when I found out that the person who killed my father had died," because he was out on parole and he died of natural causes. He said, "It didn't bring my father back, but it let me know that he wasn't walking the streets." *That's the same way I feel about Carlton. It won't bring him back, but if [appellant is] put to death, he won't kill another policeman, and let other people know you can't kill a policeman and get away with it, get out in 20 years and walk the streets.* [Emphasis supplied.]

Manifestly, because a presentence investigation report prepared in a death penalty case cannot contain any recommendation as to sentence, *see* Art. 27, § 413(c)(iv), any sentencing recommendation made by a witness at the sentencing phase of a capital case is likewise inadmissible. Furthermore, the above testimony contravenes § 413(c)(v) because it is not relevant to sentence, and does nothing more than incite the passion and prejudice of the sentencing authority. *See* Art. 27, § 414(e)(1). The prosecutor, I might add,

goaded Mrs. Fletcher into a discussion concerning her daughter's reaction to the appearance of the victim at the time of the wake:

> My father took her up to the casket and held her up so she could see him, and the first thing she wanted to know is, "Why does my daddy have that scar on his neck?" 'cause she could see where they had stitched his neck back together, and he had the scar. That's the first thing she noticed.

The sole purpose of this statement was to arouse the passion of the sentencer. Consequently, this testimony was inadmissible.

In response to the prosecutor's question of whether Mrs. Fletcher wanted to relate anything else concerning the impact of her husband's death, she stated:

> Not really, I just know what my parents have gone through, what his parents have gone through. My aunt was very close to him. She's had two strokes since it happened. My mother has been back in the hospital four or five times since it happened, because she was so worried about me and what effect it would have on me and the baby. Right now I guess I still can't believe you can shoot someone and then plead insanity. I just can't believe that.

The Court, of course, cannot explain how this testimony passes constitutional or statutory muster.

Although the live testimony of Minh's mother is irrelevant for the reasons detailed in Section IIIB, it is nonetheless important to note that her testimony, in its present form, would in any event be inadmissible at appellant's capital sentencing proceeding. It is unnecessary to quote at length her testimony because much of it mirrors that contained in the victim impact statement she submitted, such as the important role an eldest son has in ancestoral worshipping under the Vietnamese religion, the grief and bereavement of the family, and the emotional problems of

Minh's siblings. In an intensely passionate statement, Minh's mother vividly expressed her emotions:

> I did not lost only a son, but I lost a friend. I lost my future. At work, I did not cry. Only the time I have to cook and in front of my children, I try my best not to cry, but at other time, when I stay on the subway early in the morning and in the afternoon, I cry, I cry, and in the midnight, I wake up, and I walk in the room. I touch my son book, I took my son clothes. I call "Minh," wherever. I wept for my Minh, wept for my Minh. Please kill me. Don't kill my son. Please cut my hand, please cut my arm. Give my son back.

* * * * * *

> Please give my son back to me. He want to live.

As with Mrs. Fletcher's testimony, this testimony constitutes an arbitrary factor in the death penalty decisional process, and is therefore barred by the eighth amendment ban against cruel and unusual punishment.

V

Here, the victim impact evidence admitted by the court was a contributing factor to the imposition of the death penalty. The sentencer made clear on the first day of the capital sentencing proceeding that "I'm going to take the victim impact statement into consideration." That he did so is clear from his comments on the day he actually imposed the death sentence. Immediately after sentencing appellant to death, the court stated:

> [Y]ou participated in a tragedy which snuffed out the lives of two beautiful people, Carlton Fletcher and Minh Phamdo. You've deprived two families of a father, a son, a grandson, a brother and a husband, and deprived the citizens of Prince George's County of a conscientious, hard working police officer, and an industrious, hard working new American citizen whose potential was unlimited. Reckless and wanton and deliberate killings have

become all too frequent in today's world. I hope and pray that the imposition of this sentence will deter someone in the future from following in your footsteps, Mr. Lodowski.

The Court notes that "[i]t is clear from the record here that the sentencing court did not [consider the victim impact evidence as an aggravating circumstance]." The transcript of the sentencing proceeding merely supports the proposition that the sentencer did not articulate as an aggravating circumstance the impact of the murders upon the victims' families. But it is indisputable that the victim impact evidence played an active role in the sentencer's decision to impose the death penalty. Thus, what we are left with is the fact that the sentencer considered the victim impact evidence but did not characterize it as an aggravating circumstance. In my view, this procedure fails to comport with Art. 27, § 413.

Once the sentencing authority finds beyond a reasonable doubt the existence of one or more aggravating circumstances, it is required to consider whether any mitigating circumstances exist based upon a preponderance of the evidence. If the sentencer finds that one or more mitigating circumstances exist, it must determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances. If the sentencer finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.

Of the ten aggravating circumstances listed in § 413(d), none specifically provides for consideration of victim impact evidence. Moreover, § 413(d) does not contain a "catch-all" similar to that set forth in the mitigating circumstances subsection (§ 413(g)) that would permit the sentencing authority to consider victim impact evidence. In the case *sub judice,* the sentencer did not consider the victim impact evidence as a mitigating circumstance. For obvious rea-

sons, victim impact evidence would rarely, if ever, be considered as a mitigating circumstance. Thus, the sentencer necessarily must have considered that evidence as an aggravating circumstance without entering it into the formal statutory weighing process. Nowhere does § 413 permit the sentencing authority to weigh the mitigating and aggravating circumstances, then the victim impact evidence, at the time of sentencing. The imposition of the death penalty in this case therefore did not comport with the sentencing procedures contained in § 413.

## VI

In my view, the only purpose in allowing members of the victim's family in a capital sentencing proceeding to vent their passions and express their grief, as in this case, is to exacerbate the aggravating circumstances established by the prosecution. These demonstrations are arbitrary and capricious and create a frenzied environment for the defendant. How can he challenge any testimony that expresses bereavement, religious harm, or infant sorrow? The defendant must remain mute while the victim's family pleads for its "pound of flesh."

I realize that the victims of heinous crimes seek to have a voice in the criminal justice process to assure themselves that the guilty are properly and adequately punished, and I find no fault with their participation as long as it remains within constitutional bounds. But the halls of justice should not be the forum by which their cries for vengeance should be heard. The courts of this great country stand as bulwarks against tyrannical executives, oppressive legislators, and even uncontrolled, outraged citizens. We in Maryland should never allow family members to wave the murder victim's bloody shirt before the sentencer and holler: "Death to the accused!" If we lose sight of our mission we shall not only dig the grave of the defendant but also bury justice in the mire of our vengeful labor.